IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL SOCKWELL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-913-WKW |
| | ) | [WO] |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Michael Sockwell, a death-sentenced inmate in the custody of the Alabama Department of Corrections, has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his conviction for the capital murder of Isaiah Harris and the resulting death sentence he received in February 1990. Sockwell claims that his conviction and sentence were obtained in violation of his rights under the United States Constitution. For the reasons stated below, the petition will be denied.

# I. BACKGROUND

"In the late evening hours of March 10, 1988, Isaiah Harris, a deputy sheriff in Montgomery County, Alabama, was shot in the head while he was driving to work." *Sockwell v. State*, 675 So. 2d 4, 12 (Ala. Crim App. 1994).  Montgomery police identified a car found near the scene of the murder as belonging to Lorenzo "Bobo" McCarter.  *Id*. at 13.  McCarter was known by police to be involved in an affair with Louise Harris, the wife of Isaiah Harris.  *Id*.  Freddie Patterson, who was an acquaintance of petitioner, McCarter, and co-defendant Alex Hood, testified that he was with the three men as they drove around Montgomery before Harris's murder.  *Id*. at 12.  According to Patterson, sometime after 10:00 p.m., McCarter drove the group in Hood's vehicle to the Regency Park subdivision off Troy Highway in Montgomery, where they circled a block and someone in the car identified a specific car in a driveway.  *Id*. at 12–13.  With that, petitioner exited the vehicle with a shotgun and some clothes and McCarter drove the group to a nearby auto parts store.  *Id*. at 13.

While sitting in the parking lot of the auto parts store, Patterson heard a voice transmitted over a pager in the car state "something to the effect of 'He's leaving now.'"  *Id*.  After Patterson heard a loud noise, the group left the auto parts store to pick up petitioner.  Back in the car, petitioner stated that he "'had to shoot him'" and

that he (petitioner) "'was gonna . . . get his money.'" *Id*.  The group then drove to a bridge, where petitioner disposed of the shotgun and clothes.  *Id*.  Kenneth Gilmore, a friend of petitioner, testified that, the day after Harris's murder, petitioner admitted having shot someone, and that he witnessed petitioner and Hood visit a house on Pineleaf Street to pick up some money.  *Id*.  After his arrest, petitioner gave a videotaped statement in which he gave various accounts of his involvement in the Harris murder but, ultimately, admitted to the shooting and having received a share of a hundred dollars in advance of the shooting, with a prospect of receiving more from life insurance proceeds.  *See* Doc. 14-7 at 82–100.[1]

Petitioner, McCarter, Hood, and Louise Harris were charged with Isaiah Harris's murder.  Specifically, petitioner was charged in a two-count indictment alleging, in Count I, that he shot Isaiah Harris "for a pecuniary gain or other valuable consideration or pursuant to a contract or for hire," in violation of Ala. Code § 13A-5-40 (1975), as amended, and, in Count II, that he shot Isaiah Harris "while he was a police officer . . . and while he was on duty, or because of an official or job-related

---

[1] Citations to the court reporter's transcript of petitioner's trial will be formatted in this order as "R. at x" and will utilize the pagination original to the reporter's transcript.  The court reporter's transcript can be found in Volumes I-VI of the state court record, accessible at docket number fourteen in the ECF system.  By contrast, citations to the clerk's record, the state court record on appeal, and the record of petitioner's Rule 32 proceedings will utilize the docket number and PDF page number generated in the ECF system and appearing at the top of the document.

act or performance," in violation of Ala. Code § 13A-5-40 (1975), as amended.  Doc. 14-7 at 9–10.[2]

Petitioner was convicted of capital murder as charged in Count One of the indictment.  The jury recommended, by a vote of seven to five, that he be sentenced to life imprisonment without parole.  The trial court overrode the jury's recommendation and sentenced petitioner to death.  Petitioner's conviction and sentence were affirmed by the Alabama Court of Criminal Appeals ("ACCA").  *Sockwell*, 675 So. 2d at 38.  The Alabama Supreme Court ("ASC") affirmed, issuing a reasoned opinion denying petitioner's claim pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and summarily rejecting his other claims of error.  *Ex parte Sockwell*, 675 So. 2d 38 (Ala. 1995).  The United States Supreme Court denied certiorari review.  *Sockwell v. Alabama*, 519 U.S. 838 (1996).

On June 23, 1997, petitioner filed a petition for relief from his conviction and sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure ("Rule 32 petition") in the Circuit Court of Montgomery County, Alabama.  Doc. 14-15 at 6–86.  In 2009, following amendments to the Rule 32 petition, and without affording

---

[2]  In a pre-trial hearing, the State moved to *nolle pros* Count II because the trial court had previously ruled in the Louise Harris prosecution that Isaiah Harris was not on duty at the time he was shot.  R. at 112–13.

4

an evidentiary hearing, the Circuit Court granted the State's motion to dismiss the operative amended Rule 32 petition.  Docs. 14-20 at 130–202; 14-21 at 3–88.  The ACCA affirmed, *Sockwell v. State*, 152 So. 3d 455 (Ala. Crim. App. 2012), and the ASC denied Sockwell's petition for certiorari review.  *Ex parte Sockwell*, 140 So. 3d 945 (Ala. 2013).  On December 12, 2013, petitioner filed the instant federal habeas corpus petition.

## II.  PETITIONER'S CLAIMS

Petitioner asserts the following five claims for habeas corpus relief:

(1)  The State exercised its peremptory challenges of jurors in a racially discriminatory manner in violation of the Fourteenth Amendment's Equal Protection Clause;

(2)  The trial court violated petitioner's Sixth and Fourteenth Amendment right to present witnesses in his defense by permitting Louise Harris to invoke her Fifth Amendment privilege against self-incrimination and refuse to testify at his trial;

(3)  The prosecutor's repeated references during closing argument to out-of-court inculpatory statements by petitioner's non-testifying co-defendants violated the Sixth Amendment's Confrontation Clause;

(4)    The trial court's consideration of extra-record information in overriding the jury's recommendation of life imprisonment and sentencing petitioner to death violated the Eighth and Fourteenth Amendments; and,

(5)    Petitioner cannot constitutionally be sentenced to death because he is mentally retarded.[3]

## III.  STANDARDS OF REVIEW

Respondent argues that petitioner's second and fourth claims are procedurally barred from federal habeas review while his remaining claims cannot survive the deferential review required by 28 U.S.C. § 2254(d).  The standards and criteria to be applied in evaluating these defenses are set out below.

### A.    Procedural Defenses.

Respondent contends that Claims II and IV are procedurally defaulted because petitioner did not exhaust the claims in the state courts and there is now no available remedy for him to exhaust the claims.  A state prisoner seeking habeas corpus relief must first exhaust the remedies available to him in the state courts before seeking relief in federal court.  28 U.S.C. § 2254(b)(1)(A).  "The prisoner exhausts his

---

[3] This order employs the terminology utilized by the petition—filed in 2013—in summarizing the petition's claims.  In the intervening years, courts have adopted the term "intellectual disability" to describe the condition that, petitioner alleges, precludes Alabama from executing him.  Except where quoting from appellate authorities, this order will employ "intellectually disabled" in place of "mentally retarded" in its discussion of petitioner's claim.

remedies by presenting his constitutional claim to the State courts, to afford them an opportunity to correct any error that may have occurred." *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1074 (11th Cir. 2012) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*)).   The "opportunity" to resolve federal constitutional claims in the state courts must be "full and fair."   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).   Hence, the state prisoner must alert the state courts to the federal nature of a given claim.   *Duncan,* 513 U.S. at 365–66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").   To do this, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."   *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The state prisoner must "invok[e] one complete round of the State's established appellate review process."   *O'Sullivan*, 526 U.S. at 845.   This requirement obligates the state prisoner to seek even discretionary review in the state's highest court, provided that such "review is part of the ordinary appellate review procedure in the State."   *Id.* at 847.   A claim raised for the first and only time in a procedural posture in which review of claims is discretionary has not been

"fairly presented." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). *See also Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007) (finding that the habeas petitioner failed to fairly present his claims in Georgia's state courts where the claims were first raised in a petition for certiorari review to the Georgia Supreme Court).[4]

Because a federal court ordinarily may not grant habeas corpus relief when the petitioner has not exhausted available state remedies, "[i]f a petitioner fails to exhaust his state remedies, a district court must dismiss the petition without prejudice to allow for such exhaustion." *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013). If state remedies are no longer available to the state prisoner due to state procedural limitations, the unexhausted claim is generally treated as exhausted but procedurally defaulted from federal habeas review. *Id.* at 816 ("An unexhausted claim is not procedurally defaulted unless it is evident that any future attempts at exhaustion would be futile due to the existence of a state procedural bar."). *See also McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar.").

---

[4] This rule has been applied to bar federal review of claims presented, for the first and only time, in discretionary review before the ASC. *See Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900, 918–19 (11th Cir. 2017).

A claim may be deemed procedurally barred in federal habeas review, even if it was presented in the state courts, for other reasons.  For example, "[a]s a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment."  *Boyd v. Comm'r, Alabama Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  In *Boyd*, the Eleventh Circuit set out its test for determining whether a state's procedural bar is adequate and independent:

> First, the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim. Second, the state court decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law.  Finally, the state procedural rule must be adequate; i.e., it may not be applied in an arbitrary or unprecedented fashion.  The state court's procedural rule cannot be manifestly unfair in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine. In other words, a state procedural rule cannot bar federal habeas review of a claim unless the rule is firmly established and regularly followed.

*Id.* at 1335–36 (quotations and citations omitted).

A federal court may consider a procedurally defaulted claim only if the petitioner can show (1) cause for the procedural default in the state courts and prejudice flowing from the asserted federal violation, or (2) that a fundamental

miscarriage of justice will result if the federal claim is not considered on its merits. *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013). "As a general matter, 'cause' for procedural default exists if 'the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner may achieve this threshold by showing, for instance, that "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray*, 477 U.S. at 488 (citations and quotations omitted). Likewise, the ineffective assistance of counsel may constitute "cause" for a procedural default of a federal claim in the state courts. *Id.*

In addition to cause, the habeas petitioner must demonstrate actual prejudice to overcome a procedural default. "Actual prejudice means more than just the possibility of prejudice; it requires that the error 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ward v. Hall*, 592 F.3d 1144, 1178 (11th Cir. 2010) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Finally, a federal court may review a procedurally defaulted habeas claim on the merits, even in the absence of cause or prejudice, if necessary to remedy a

"fundamental miscarriage of justice." A fundamental miscarriage of justice occurs if a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. To show a fundamental miscarriage of justice based on asserted actual innocence, the petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## B.   Review Pursuant to 28 U.S.C. § 2254(d).

For those claims presented and decided on the merits in the state courts, this court is to apply the standard of review set out in § 2254(d)(1) and (2), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "In reviewing whether a state court's decision was based on an 'unreasonable

12

determination of the facts' under § 2254(d)(2), [the court] presume[s] the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons v. Warden, GA Diagnostic & Classification Prison*, 695 F.3d 1202, 1206 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). "This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts." *Id.* (citing *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

While "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, is formidable. As the Supreme Court has explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation and citations omitted). *See also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").

The force of AEDPA's "daunting" standard of review is demonstrated in other ways. For example, AEDPA deference is owed when a state court has summarily denied relief on a claim. That is, where there is no "opinion from the state court explaining the state court's reasoning," the habeas petitioner still must show "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. Thus, faced with a state court's summary disposition on the merits, "a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id*. at 102. Furthermore, even where the state court has provided a reasoned decision, AEDPA still requires the federal court to "consider any potential justification" for the state court's ultimate disposition, even those not expressly offered by the state court. *Pye v. Warden,*

*Georgia Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc).  Put another way, while a federal court in habeas must "evaluate the reasons offered by the [state] court," if the state court's reasons can be justified "on a basis the state court did not explicate, the state-court decision must still stand."  *King v. Warden, Georgia Diagnostic Prison*, 69 F.4th 856, 867 (11th Cir. 2023).

If petitioner succeeds in surmounting the formidable obstacles imposed by AEDPA, then this court is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (citation and internal quotation marks omitted).  Even in *de novo* review, however, with limited exceptions, the court may not grant habeas corpus relief unless the state court error at issue was harmless.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  "In collateral cases, a federal constitutional error is harmless unless it imposed 'actual prejudice.'"  *Sears v. Warden*, *GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (quoting *Brecht*, 507 U.S. at 637–38).  Actual prejudice results when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

# IV.  DISCUSSION

## A.    Claims Two and Four are not Procedurally Defaulted.

Before addressing petitioner's contention that the state courts unreasonably adjudicated his constitutional claims on the merits, the court first considers respondent's affirmative defense that Claims Two and Four are procedurally defaulted.  For the reasons that follow, respondent's procedural default defense fails.

To review, Claim Two alleges that petitioner's Sixth and Fourteenth Amendment right to present witnesses in his defense was violated when the trial court failed to determine whether Louise Harris's invocation of her Fifth Amendment privilege against self-incrimination at petitioner's trial was valid and legitimate.  Pet. ¶¶ 76–77.  Claim Four alleges that petitioner's Eighth and Fourteenth Amendment rights were violated when the trial judge overrode the jury's life recommendation and sentenced petitioner to death based, in part, on extra-record evidence that was not introduced at petitioner's trial.  Specifically, petitioner alleges that, nearly a year after the trial judge announced petitioner's death sentence in court, he issued a written sentencing order that "made numerous inflammatory references to evidence from the trial of Louise Harris that had never been presented at Mr. Sockwell's trial, and that Mr. Sockwell had no opportunity to challenge or rebut."  Pet. ¶ 113.

16

Respondent contends that Claims Two and Four are unexhausted because petitioner failed to fairly present the claims to the state courts. Furthermore, respondent asserts, because state law precludes petitioner from returning to state court to exhaust the claims, the claims are procedurally defaulted from federal habeas review and, consequently, are due to be dismissed. Doc. 13 at 11, 19. Although respondent argues that petitioner failed to exhaust both claims, the circumstances of petitioner's purported failure to exhaust differ slightly and, therefore, deserve further explanation.

Respondent argues that petitioner failed to present Claim Two in his direct appeal to the ACCA, and that his subsequent presentation of Claim Two in his petition for certiorari review in the ASC was insufficient to fairly present and exhaust the claim because petitioner did not raise the claim at all levels of state court review. Doc. 13 at 12. Respondent argues that petitioner failed to exhaust Claim Four because in his direct appeal to the ACCA he challenged the trial court's reliance on extra-record evidence exclusively on state law grounds. *Id*. at 19. Respondent further asserts that petitioner did not present a federal constitutional challenge to the trial court's reliance on extra-record evidence until his petition for certiorari review in the ASC, which, respondent maintains, for the same reasons as Claim Two, was insufficient to exhaust the claim in the state courts.

17

Petitioner concedes that he did not present Claim Two on direct appeal to the ACCA, and that he first presented the claim in his petition for certiorari before the ASC.  Pet. ¶ 77.  Likewise, with respect to Claim Four, petitioner concedes that, while he "assigned the trial court's decision as error on direct appeal" to the ACCA, he "raised his constitutional claim to the Alabama Supreme Court."  Pet. ¶ 114.  In essence, therefore, petitioner and respondent appear to be in agreement that both Claim Two and Claim Four were raised as federal constitutional claims in the state courts, for the first and only time, in the ASC.[5]

Were that the end of the inquiry, and assuming the accuracy of respondent's contention that Alabama law precludes petitioner from returning to the state court to exhaust the claims, then the authorities outlined previously might compel the

---

[5] Upon review of the record, it appears to the court that petitioner *did* raise the constitutional argument presented in Claim Four on direct appeal to the ACCA.  In his supplemental brief in the ACCA, petitioner challenged, on federal constitutional grounds, the trial court's adoption of a proposed sentencing order that contained the information and findings from Louise Harris's trial.  *See* Doc. 14-9 at 133–42.  This portion of petitioner's supplemental appellate brief is substantially similar to the portion of his brief in the ASC which, the parties appear to agree, articulated Claim Four in the ASC.  *Compare* Doc. 14-9 at 133–42 *with* Doc. 14-12 at 124–33.  In particular, petitioner's supplemental brief in the ACCA cites and heavily relies upon the same authority, *Gardner v. Florida*, 430 U.S. 349 (1977), that he relied upon in the ASC and that he cites as governing Claim Four in the instant petition.  *See* Doc. 14-9 at 140–42; Pet. ¶ 116.  Nevertheless, because petitioner is the master of the petition, the court defers to his concession that he did not present his constitutional claim until his brief in the ASC.  Because, for reasons that will be explained in the text, the court ultimately would not find Claim Four procedurally defaulted even if it was not presented in the ACCA, the court need not proceed further.

conclusion that Claims Two and Four are procedurally defaulted in federal habeas corpus because they were not fairly presented at all levels of Alabama's review process. The Supreme Court has recognized, however, that it is "reasonable to infer an exception" to the fair presentation requirement grounded in the decision of a state's highest appellate court to adjudicate a claim that was not presented to a lower court. *See Castille*, 489 U.S. at 351. *Castille* based this exception on pragmatism, remarking that, where a state's highest court "has actually passed on the claim," "it is fair to assume that further state proceedings would be useless." *Id.* *Castille*'s inferred exception thus spares both the petitioner and the state courts from collateral relitigation of a claim that has already been decided by the state's highest court on direct review.

Other appellate courts have recognized this exception explicitly. *See*, *e.g.*, *Casey v. Moore*, 386 F.3d 896, 916 n.18 (9th Cir. 2004) ("Of course, a claim is exhausted if the State's highest court expressly addresses the claim, whether or not it was fairly presented.") (citing *Castille*, 489 U.S. at 351). Thus, because the exhaustion requirement is itself "grounded in principles of comity[,]" *Mauk*, 484 F.3d at 1357, courts may reasonably infer that a claim already decided on the merits by the state's highest court, whether it was fairly presented in one complete round of the state courts' review process or not, is exhausted for purposes of federal habeas

review and is therefore not subject to the procedural bars potentially applicable to claims which were similarly presented to, but not considered by, the state's highest court.  *See Castle v. Schriro*, 414 F. App'x 924, 926 (9th Cir. 2011) (unpublished decision) ("Only if the appellate court goes ahead and considers the new issue on its merits are the interests of comity satisfied such that the federal court can properly consider the issue under 28 U.S.C. § 2254(b)(1)(A).").

Here, as the parties have acknowledged, there is no doubt that the constitutional arguments underlying Claims Two and Four were presented to the ASC in petitioner's brief in support of his petition for certiorari review.  *See* Doc. 14-12 at 81–86 (alleging federal constitutional error with respect to Harris's Fifth Amendment invocation); *id.* at 129–133 (alleging federal constitutional error with respect to the trial court's reliance on extra-record evidence in its sentencing order). Respondent does not argue, and nothing in the record indicates, that the ASC excluded from its review any of the claims raised by petitioner.  As noted previously, in its decision affirming the ACCA, the ASC provided a reasoned discussion of its rejection of only petitioner's *Batson* claim.  The ASC considered and summarily rejected petitioner's remaining claims as follows:

> We note that Sockwell has raised in this Court issues that either were not before the Court of Criminal Appeals or were not addressed in its opinion.  In a capital case, this Court may consider any issue concerning the propriety of the conviction and the death

sentence, and *we have thoroughly considered each issue Sockwell has raised*.  We have also independently searched the record for reversible error, considering the applicable law as it relates to the facts of this case, and have found none.

*Ex Parte Sockwell*, 675 So. 2d at 42 (emphasis added).

It is well-settled that a state court may summarily decide the merits of a constitutional claim without providing a "statement of reasons," and that a federal court is obligated to treat such a summary decision as a decision on the merits for purposes of applying the AEDPA.  *See Harrington*, 562 U.S. at 98.  Indeed, the state court is not even required to affirmatively indicate that it decided a claim on the merits before the federal court must treat it as having done so.  *Id*. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Here, petitioner plainly presented the relevant federal claims to the ASC and that court affirmatively indicated that it "thoroughly considered" such claims, notwithstanding any failure to present them to the ACCA, and found no error. Because the ASC therefore adjudicated the merits of petitioner's federal claims, this court may reasonably infer that Claims Two and Four were adequately exhausted for purposes of the AEDPA, or, alternatively, that they are excepted from the requirement of "fair presentation" at all levels of Alabama's review process, and,

21

consequently, they are not procedurally defaulted.  Accordingly, the court will consider whether the ASC's summary decision denying the claims is "contrary to, or involved an unreasonable application of, clearly established Federal law" or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) & (2).

## B.  Review Pursuant to 28 U.S.C. § 2254(d)(1) and (2).

### 1.  Claim One

Claim One is petitioner's claim that prosecutors exercised peremptory challenges in a racially discriminatory manner at his trial, in violation of the Equal Protection Clause of the Fourteenth Amendment, as explicated in *Batson*.  Pet. ¶ 39. Specifically, the petition alleges a constitutional violation with respect to only one of the prosecutors' peremptory challenges, that of veniremember Eric Davis.  *See* Pet. ¶¶ 46–75.  Petitioner's *Batson* claim challenging the Davis strike was raised on direct appeal to the ACCA, which affirmed the trial court, *see Sockwell*, 675 So. 2d at 18–20, and was the subject of the ASC's reasoned opinion affirming his conviction and sentence.  *See Ex Parte Sockwell*, 675 So. 2d at 39–41.  Because the last state court to address petitioner's *Batson* claim, the ASC, issued a reasoned decision denying the claim on the merits, this court reviews that decision pursuant to § 2254(d).

### a.    Clearly Established Federal Law

In *Batson*, the Supreme Court held that an inquiry into the motivations behind a peremptory challenge may be required to ensure that the challenge was not made for purposeful discrimination on the basis of race. "[T]he burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination."  476 U.S. at 93 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)) (quotation marks omitted).

> In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Circumstantial evidence of invidious intent may include proof of disproportionate impact. . . .
>
> . . . Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion. The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."

*Id.* at 93–94 (citations omitted).   The Court of Appeals' recent *King* decision describes the familiar three-step *Batson* procedure and how a federal court, sitting in habeas, is to review a state appellate court's application of *Batson*:

> At the first step, the defendant must establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race [or sex]. At the second step, the burden shifts to the State to come forward with a neutral explanation for its strikes. At the third step, the trial court

must find, as a matter of fact, whether the defendant has established purposeful discrimination. Typically, the decisive question will be whether counsel's race- [or sex-]neutral explanation for [the] peremptory challenge should be believed.

The trial court must consider all relevant circumstances at the third step, and the conviction cannot stand if even one of the strikes was discriminatory. When a court considers a *Batson* claim in an appeal or a state habeas proceeding, the state court's written opinion is not required to mention every relevant fact or argument for its merits determination to receive deference on review by a federal court. Instead, the petitioner must prove that the state court failed to consider that argument or fact.

*King*, 69 F.4th at 868 (quotations and citations omitted).

### b. Batson *Proceedings in the Trial Court*

The trial record indicates that there were fifty-five potential jurors in the venire at petitioner's trial. Fourteen of these fifty-five were black. After posing a number of general questions to the entire venire, the trial court proceeded to conduct individual voir dire in the jury room with the aim of "death qualifying" jurors and exploring their pretrial exposure to information about the case. Because petitioner's *Batson* claim challenges only the strike of veniremember Eric Davis, and because Davis's voir dire testimony was integral to the state courts' disposition of petitioner's *Batson* claim, the testimony of Davis during individual voir dire is reproduced here in its entirety:

THE COURT: Your name, please?

PROSPECTIVE JUROR: Eric Davis.

24

[After having first been duly sworn to speak the truth, the whole truth, and nothing but the truth, the prospective juror testified as follows:]

THE COURT: Have you heard or read from any source anything about these circumstances that we're here today on?

PROSPECEIVE JUROR: I've heard a little something.

THE COURT: Okay. Have you heard or read or from any other source gained any information as to whether or not this defendant was guilty or not?

PROSPECTIVE JUROR: Now, I had heard something.

THE COURT: You haven't?

PROSPECTIVE JUROR: I had heard something.

THE COURT: What did you hear and where was it from?

PROSPECTIVE JUROR: Oh, I just, um, it was something in the newspaper or something.

THE COURT: Well, what did you hear in the newspaper or read in the newspaper?

PROSPECTIVE JUROR: Well, I just, you know, just heard talk about what they had heard in the newspaper or something like that. I didn't read it for myself.

THE COURT: From somebody you heard?

PROSPECTIVE JUROR: Um-hum, yes.

THE COURT: When did you hear that?

PROSPECTIVE JUROR: It's been a while back.

THE COURT: About how long ago?

PROSPECTIVE JUROR: Several months ago.

THE COURT: Several months ago. Did you hear specifically about this defendant right here?

25

PROSPECTIVE JUROR: No.

THE COURT: Okay. Do you remember what you heard?

PROSPECTIVE JUROR: Not exactly.

THE COURT: Can you remember it for me the best you can?

PROSPECTIVE JUROR: Um, the only thing I recall is just, you know, um, listening at some of the guys, you know, that said they had read about it, you know, the incident out on Troy Highway, stuff like that, you know, what had happened and so forth, you know.

THE COURT: Okay. Do you feel like you'd be able to put aside whatever you had heard some of the guys say about what they had read and listen to the facts as they come to you in Court and based on those facts and those alone make a fair, honest, conscientious impartial decision on guilt and non guilt based on those facts and the law as instructed to you by the Court?

PROSPECTIVE JUROR: Yes, I can.

THE COURT: Because this is a capital case and if we were to reach a sentencing stage the possible punishments on a capital offense are life imprisonment without parole and the death penalty, so I need to ask you some questions concerning this matter if we were to get to the sentencing stage. Are you opposed to the death penalty under any circumstances?

PR0SPECTIVE JUROR: No.

THE COURT: Okay. Are you for the death penalty under all circumstances?

PROSPECTIVE JUROR: Well, it could go either way.

THE COURT: Okay. You think you could follow your oath and listen to the instructions of the Court and --

PROSPECTIVE JUROR: Yes sir. Fair enough to listen to the trial and then come up with a verdict.

THE COURT: Okay. Thank you.

[WHEREUPON, Mr. Davis was excused from the juryroom.]
R. at 340–43.

Following individual voir dire, during which the parties lodged challenges for cause, there remained forty-two potential jurors, ten of whom were black. Thus, to seat twelve jurors, each side was afforded fifteen peremptory challenges, with the last of each side's peremptory challenges to be seated as the two alternate jurors. The lead prosecutor, Montgomery County Assistant District Attorney Ellen Brooks, used eight of her fifteen challenges to remove black veniremembers. The defense used all fifteen of its peremptory challenges to remove white veniremembers. The two alternate jurors were white. Thus, two of the jurors seated at petitioner's trial were black. Eric Davis was the State's twelfth peremptory strike overall and the seventh of its eight strikes of black veniremembers.

Immediately after striking the jury, the defense moved for a *Batson* hearing. The trial court granted the motion, but opted to hold the hearing after dismissing the veniremembers who had been struck. At the *Batson* hearing, the defense cited Brooks's eight peremptory strikes of black veniremembers and argued that she must explain the reasons for her strikes. R. at 398–99. The trial court did not initially rule that petitioner had proven a prima facie case of racial discrimination, but it did prompt Brooks to respond to the defense's argument. Brooks argued that the defense's statistical showing was not sufficient under *Batson* to state a prima facie

27

case, but the trial court determined to "move forward and ask you to show me what your reasons are."  R. at 400.

Brooks then proceeded to review, in order, all thirty peremptory challenges by the prosecution and defense.  She noted the race and gender of every veniremember struck by both sides and, with respect to the State's strikes, she articulated the reasons for each strike, including for the seven white veniremembers struck by the State.  R. at 401–09.  Regarding Eric Davis, Brooks stated the following:

> We then struck number one twelve, Eric Davis, was a black male, according to our records twenty-three years old. He was extremely vague to the Court's questions about what he had heard. You might remember he said well, I just heard a little something and he kept -- well what did you hear? Where did you hear it? He said well, in the paper or something.  The Court asked him again. He was unclear and then finally he said well, some people were talking about it. I never really read the paper. He could not remember what he heard. He said that he could go either way but he was not pro death penalty, and personal observations of the attorneys.

R. at 407.  Brooks concluded her summation by explaining that the State relied upon "a compilation of information," including the jurors' responses to questioning, how the jurors "look," and whether they were "freely responding" or "hesitant" in their answers.  She also mentioned that prosecutors had obtained information about jurors' age, residences, employment, spouse's employment, criminal histories, and

that they had gone over the juror lists with their case agent and "sheriff's officers."
R. at 410.

The defense requested disclosure of the prosecutors' notes from jury selection
so that it could attempt to show that Brooks's stated reasons for her strikes of black
veniremembers were pretext for discrimination.  R. at 412.  The trial court denied
this request.  The lead defense attorney, Ron Wise, then examined Brooks at length
regarding her stated reasons for striking certain jurors.  It was during this exchange
that Brooks made the pivotal remark that was the crux of petitioner's *Batson* claim
before the state appellate courts.

> Q.    Eric Davis, number one twelve?
>
> A.    Was it a strike?
>
> Q.    Correct. A black male.
>
> A.    All right, sir.
>
> Q.    Your reasons again for striking Mr. Davis?
>
> A.    You want me to repeat them?
>
> Q.    Yes, ma'am.
>
> A.    Okay. Mr. Davis, according to my notes, is a black male, approximately twenty-three years of age, *which would put him very close to the same race, sex, and age of the defendant.* He had said to the Court he had heard a little something. The Court questioned him further and he finally said well, I heard it from the paper or something. The Court questioned him further. He was very vague and unclear in his answer. The Court asked him more about it and he said well, some people were talking about it. I didn't actually read it. He could not remember what had been said nor anything about -- anything further

29

about those. His answers to the death penalty did not give me a lot of clues either way as to how he felt. In fact, I think the words he used were I could go either way.

Q.     Well, was the fact he said he could go either way a reason you struck him, or was it because of the other reasons he gave, such as well, he was vague as to what he had read or where he had heard it from or what it was?

A.     Well, Mr. Wise, I didn't just analyze it by one factor. The fact that he did not appear as convincing and as if he'd given it a lot of thought and was sure of how he felt was definitely a consideration, but he wasn't struck because of his death penalty views although that was a factor. His vagueness and -- I don't know if he didn't understand the Judge or if he just didn't want to talk about it or wasn't interested, I didn't know what it was, but I did not think that he was very clear on where he stood about the publicity.

Q.     Ms. Brooks, isn't it true that a substantial number of white people stated in chambers that they had heard something about it, didn't really know exactly where they had heard it, really didn't remember what they had heard. Isn't that true?

A.     I would not characterize it that way, no, sir. I don't recall any other juror, though, who changed his mind about where he had heard it. He said he read it in the paper and then further questioning said well, I didn't read it in the paper, I heard it from some friends.

THE COURT:      Is that it?

MR. WISE:  Just a minute, your Honor.

(Brief pause.)

MR. WISE:  That's all. Your Honor.

R. at 427–29 (emphasis supplied).   Wise then argued that Brooks had given

insufficient race-neutral reasons for her strikes, "in particular as to Eric Davis [.]"

The trial court was succinct: "Motion denied.  Recess till eight."  R. at 429.

30

When trial resumed the following morning, the defense renewed its *Batson* motion. The defense argued that, with respect to Davis and one other black male juror, Brooks gave "no reason, no articulable reason, and I submit to you that she can give no reason." R. at 431. The defense also cited a news report describing Brooks's use of peremptory challenges to remove fourteen black jurors in another trial only a week before petitioner's trial. The defense argued the existence of a "pattern and practice by the D.A.'s office of excluding blacks for reasons like chewing gum, not dressing properly and being in the wrong neighborhood." R. at 432. The defense requested leave to examine Brooks about her strikes in the earlier trial, but the trial court declined to permit such questioning. R. at 433. The defense again argued that a "pattern and practice" of discriminatory challenges was evident and requested that the trial court "quash the venire" and impanel a new one. The trial court again was succinct: "Motion denied. Are we ready now?" R. at 434.

In sum, the trial court held a *Batson* hearing in which it implicitly found that the defense made a prima facie showing of racial discrimination. After hearing Brooks's stated reasons for her peremptory strikes and the defense's argument in response, the trial court summarily denied the defense's *Batson* motion. The trial court adhered to this ruling after the defense renewed its *Batson* motion and

31

presented additional argument about Brooks's so-called "pattern and practice" of discriminatory jury strikes in other cases.

### c.    State Court Appellate Review

Although this court is to apply AEDPA's standard of review to the ASC's decision denying petitioner's *Batson* claim, the ACCA's decision denying the claim provides important context for understanding the ASC's decision and, therefore, warrants some review.

On direct appeal to the ACCA, petitioner argued that the trial court erred in refusing to quash the venire as a result of his *Batson* motion. His brief raised prior instances in which Brooks was found by Alabama's appellate courts to have violated *Batson* and further noted several instances in which, he argued, Brooks did not strike white jurors for the same reasons that she gave for striking black jurors. He also specifically raised the Davis strike and referenced Brooks's remarks comparing the race of Davis and petitioner as demonstrating that Brooks articulated a race-based reason for her strike of Davis.

In its opinion, the ACCA noted the statistics underlying the State's peremptory strikes at petitioner's trial. *Sockwell*, 675 So. 2d at 18. Regarding the Davis challenge, the ACCA concluded that, in comparing the race of Davis and petitioner, Brooks had articulated, in part, an explicitly racial reason for her strike.

*Id.* at 20.  In addition, the ACCA found that Davis's age and sex were not legitimate bases for striking him because no jurors were questioned about age-related biases and the "prosecution failed to establish that gender was relevant to the case."  *Id.* Furthermore, "the prosecution did not strike white males of a similar age."  *Id.*

Nevertheless, the ACCA went on to find that Brooks also articulated a "sufficiently race neutral reason" for the Davis strike when she cited his "vague" responses to questions about what information he had learned about the case and from where he had received his information.  *Id.*  The ACCA found that, "[u]nlike other veniremembers, [Davis] appeared to be less than candid in regard to his exposure to pretrial publicity.  Specifically, [Davis] first stated that he had read about the case and then stated that he had heard about the case."  *Id.*  In essence, therefore, the ACCA concluded that the trial court's denial of petitioner's *Batson* claim was not clearly erroneous because, despite Brooks's articulation of an explicitly racial reason for her strike, she also articulated a sufficiently race-neutral reason for the strike that it found corroborated by the record.

As mentioned previously, the ASC addressed petitioner's *Batson* claim, including the Davis strike, in a reasoned opinion.  In short, the ASC affirmed the ACCA's decision but rejected its reasoning in reaching that decision.  The ASC first noted Brooks's removal of eight of the ten black jurors in the venire.  *Ex parte*

*Sockwell*, 675 So. 2d at 40. It then recited the pertinent parts of the state court record respecting the Davis strike, including Brooks's initial articulation of her reasons for striking Davis, followed by her response under questioning from Wise when she noted that Davis was "very close to the same race, sex, and age of the defendant." *Id*. The ASC then explained where it parted ways with the ACCA's analysis:

> We do not agree with the Court of Criminal Appeals that the prosecutor's opening remark identifying E.D. as a black man was given as a *reason for striking him* from the venire; on the contrary, given the context of the entire exchange, we conclude that this was merely a descriptive identification of the veniremember based on the prosecutor's notes. When the prosecutor gave the reasons for striking a veniremember, either white or black, she first prefaced her remarks by stating the veniremember's race and sex, as she did with E.D. The only *reasons* the prosecutor gave for striking E.D. were his vagueness and lack of candor in stating what he had already heard about the trial, from what source he has gotten this information, and whether he could be willing to recommend the death penalty.

*Id*. (emphasis in original).

The ASC went on to "emphasize [its] disagreement with the [ACCA's] inference that a peremptory strike may be upheld if it is based only *partly* on race, that is, if the prosecutor articulates both a racially motivated reason and race-neutral reason for a strike." *Id*. (emphasis in original). According to the ASC, the ACCA had erroneously found justification for this "inference" in state court precedent that "cannot be read to suggest that a non-race-neutral *reason* given for a peremptory

strike will 'cancel out' a race-based reason[.]" *Id*. at 41 (citing *Owens v. State*, 531 So. 2d 22 (Ala. Crim. App. 1987) (emphasis in *Sockwell*).

The ASC concluded its reasoned discussion of the Davis *Batson* claim as follows:

> The trial court, which must be given great discretion in determining the context in which race was mentioned, found that the strike was race-neutral. After considering the entire context of the prosecutor's explanation, we find no abuse of this discretion. The Court of Criminal Appeals' disposition of this issue was correct, although its rationale was not.

*Id*. at 41.  The ASC did not address several circumstances raised by petitioner in his briefing, including Brooks's history of *Batson* violations, his argument that Davis was not vague or lacking in candor in his voir dire responses, and his claim that Brooks did not strike white jurors who were similarly vague in their voir dire responses.

### d.    Petitioner's Arguments Pursuant to § 2254(d)(1) and (2)

Petitioner alleges that the ASC's decision denying relief on his Davis *Batson* claim fails both prongs of § 2254(d)'s standard of review.  He first argues that, pursuant to § 2254(d)(2), the ASC made an unreasonable determination of fact at step two of *Batson* when it found that Brooks's remark comparing his and Davis's race was not a reason for striking Davis, but was, instead, "merely a descriptive identification of the veniremember" based upon Brooks's notes.  He posits that, even

35

if Brooks's first mention of Davis's race in the relevant remarks ("Okay, Mr. Davis, according to my notes, is a black male") could reasonably be deemed merely a descriptive identification of Davis, the second reference to Davis's race ("which would put him very close to the same race, sex, and age of the defendant") cannot be so reasonably construed.  He argues that the "only plausible interpretation of that statement is that the prosecutor struck Mr. Davis at least in part because she believed that a juror of the 'same race' as Mr. Sockwell would be less likely to convict him—precisely what the Constitution forbids."  Pet. ¶ 53.

With respect to § 2254(d)(1), petitioner alleges that the ASC unreasonably applied *Batson* because it failed to properly conduct the third step of the *Batson* analysis – evaluating Brooks's race-neutral reasons for her strike of Eric Davis to determine whether he established purposeful discrimination.  Pet. ¶ 57.

Finally, petitioner claims that, pursuant to both prongs of § 2254(d), even if it is determined that the ASC implicitly considered the relevant circumstances at step three of *Batson*, its decision was an unreasonable application of *Batson*, and was based upon unreasonable determinations of fact, because all relevant circumstances "overwhelmingly demonstrated discriminatory intent."  Pet. ¶ 61.  He identifies the same three principal circumstances demonstrating such discriminatory intent that he presented to the ASC: a) Brooks's exclusion of 80% of eligible black

veniremembers; b) Brooks's history of *Batson* violations; and c) that Brooks's supposedly race-neutral reasons for striking Davis were pretext for discrimination because they are not supported by the record and the rationale supporting those reasons applied equally to white veniremembers she did not strike.  *Id*. at ¶¶ 62-68.

Each of these arguments is addressed in turn.

### e.    *Application*

### i.    *The ASC reasonably concluded that Brooks did not articulate a race-based reason for her strike of Davis.*

Petitioner first challenges the ASC's factual finding that Brooks's mention of Davis's race and her comparison of the race of petitioner and Davis was not given as a reason for striking Davis, but, instead, was merely a "descriptive identification" of Davis that was joined with a "mention" of petitioner's race and was all "part of the same predicate of identification that she mentioned for all the veniremembers she had struck, both white and black."  675 So. 2d at 41.  As noted previously, he must rebut the ASC's finding of fact with clear and convincing evidence in order to overcome the statutory presumption of correctness of 28 U.S.C. § 2254(e)(1), and he must show that the ASC's erroneous finding of fact was "unreasonable" within the meaning of § 2254(d)(2).  Even if he succeeds in showing erroneous state court factfinding by clear and convincing evidence, he "does not necessarily meet his burden under § 2254(d)(2)" because, "[d]epending on the importance of the factual

error to the state court's ultimate 'decision,' that decision might still be reasonable[.]" *Pye*, 50 F.4th at 1035.

The only evidence that petitioner submits to satisfy his burden is the trial transcript, the very evidence that was reviewed and interpreted by the ASC in its opinion. This evidence, however, does not clearly and convincingly establish that the ASC erred in its factfinding, much less that its decision was based upon an unreasonable finding of fact. At least two compelling circumstances apparent in the transcript inform this judgment.

*First*, rather than focusing upon the subject remark in isolation, which is comprised of less than twenty words and was not subject to any further inquiry by the trial court or the defense, the ASC reasonably considered the entire transcript of voir dire when discerning what were Brooks's reasons for her strike of Davis. By the time Brooks made the subject remark, she had already plainly articulated a race-neutral reason for her strike of Davis—his vagueness on the question of his pretrial exposure to information about the case—without drawing the racial comparison that would later become the crux of petitioner's *Batson* claim. And, immediately after the subject remark, she repeated this same justification and expanded on it further when questioned by defense counsel. The ASC was not unreasonable in considering Brooks's mention of Davis's race and her racial comparison of Davis and petitioner

38

in this larger context when it found that the subject remark was not a reason for her strike.

*Second*, while an interpretation of the subject remark holding it as a reason for Brooks's strike might be reasonable, as was found by the ACCA, it does not follow that a contrary interpretation, as found by the ASC, is unreasonable. Petitioner posits that Brooks's remark was an unambiguous declaration of racial animus that she had managed to conceal until questioned by defense counsel. Pet. ¶¶ 52–53. For petitioner, Brooks's remark was the functional equivalent of her declaring, "I struck Eric Davis because he is a young black male like the defendant," but, since "*Batson* does not require such a superficial degree of specificity," Doc. 26 at 2, the ASC was unreasonable in failing to ascribe this meaning to it. While he concedes, for obvious reasons, that it is "so rare for prosecutors to say expressly on the record that race has factored into one their peremptory strikes." *id*. at 1, he nevertheless alleges the ASC was unreasonable in failing to conclude that this "rare" event in fact occurred at his trial.

The ASC's finding of fact, however, is bolstered here by the trial court record, which shows that, at the time it was uttered, apparently no one, including the defense, believed that Brooks had just committed the "so rare" act of admitting that she struck a juror because of the juror's race. This is significant because, in addition to the

*Batson* hearing record excerpts quoted above, the trial transcript shows that defense counsel were highly attuned to *Batson* issues.  For example, counsel argued before jury selection commenced that the assembled venire was insufficiently "representative of a cross-section of the community."  R. at 126.  Counsel objected and noted for the record when black jurors were challenged for cause.  R. at 222, 287, and 311.  Counsel even objected when a black juror who expressed a predisposition to convict was excused by the trial court.  R. at 243, 247.  Along with counsel's very capable and determined argument at the *Batson* hearing, these instances show counsel's vigilance in guarding against *Batson* violations and building a record to support the *Batson* claim.

It is implausible in the face of this record that defense counsel would allow the functional equivalent of Brooks declaring, "I struck Eric Davis because he is a young black male like the defendant," to pass without notice.  Yet, this is exactly what happened in petitioner's version of events, as, overlooking Brooks's purported umambiguous declaration of her racial animus, counsel moved on to clarifying with Brooks whether Davis was struck because of his views about the death penalty or his vagueness about his exposure to pretrial publicity.  It is more plausible that counsel was focused on exploring the legitimacy of what everyone in the room understood to be Brooks's professed reasons for her strike, reasons that she had

articulated multiple times with consistency, and he therefore tailored his questioning accordingly.[6]

At a minimum, a reviewing court reasonably would expect the "rare" and likely dispositive admission that a prosecutor struck a juror because of the juror's race to be the subject of heightened inquiry and argument at the time it was made. There is no subtlety in a prosecutor confessing her naked violation of *Batson*.  The fact that neither the trial court nor defense counsel timely raised, nor followed up with, the specific objection to Brooks's remarks that was later raised on appeal is not, alone, dispositive of the *Batson* claim.  It is, however, probative of whether fairminded jurists—like those comprising the ACCA and the ASC—can disagree about the meaning of the remarks.  Thus, the ASC was not unreasonable for failing to conclude that Brooks had been exposed in a sort of "Perry Mason moment" that somehow went unnoticed until the appellate briefs were filed.

The core premise of the ASC's opinion—the reason that the ASC issued a written opinion at all—was to correct what it perceived as the ACCA's erroneous finding that Brooks's reference to the race of Davis and petitioner was necessarily given as a reason for her strike.  The ASC clarified that the ACCA's own precedent

---

[6] Petitioner has not alleged that counsel performed ineffectively in failing to question Brooks about her supposed race-based reason for her strike of Davis or argue to the trial court that Brooks had offered a race-based reason for her strike.

recognized that a prosecutor's "incidental" reference to race in a *Batson* proceeding "'does not, as a matter of law, establish purposeful discrimination.'" *Ex parte Sockwell*, 675 So. 2d at 40–41 (quoting *Owens*, 531 So. 2d at 25).

Alabama's appellate courts are not alone in concluding that a prosecutor's reference to race while defending against a *Batson* challenge does not necessarily establish purposeful discrimination on the part of the prosecutor. Federal courts have rejected similar claims, especially where review is circumscribed by AEDPA. *See, e.g., Cook v. LaMarque*, 593 F.3d 810, 820–21 (9th Cir. 2010) (*Batson* claim rejected in habeas despite that the prosecutor expressed a concern that, due to his past experiences with racism and law enforcement, a black juror "might be inclined to be sympathetic and leaning toward the defense in this case in light of the race of two of the defendants"). There is some logic to this—a prosecutor's reference to the race of a challenged veniremember in a context where the prosecutor is accused of racial discrimination and tasked with defending his or her conduct is not tantamount to evidence of a prosecutor's preoccupation with race that exists before a *Batson* challenge. *See Moore v. Vannoy*, 968 F.3d 482, 491 (5th Cir. 2020) ("For obvious reasons, it makes sense for a prosecutor to reference the juror's race when responding to a *Batson* challenge.").

Nevertheless, in both the petition and in his updated, supplemental briefing, petitioner cites federal appellate decisions for the "proposition that, when a prosecutor references a juror's race during a *Batson* challenge, such a comment cannot be dismissed as 'descriptive,'" as the ASC did in petitioner's appeal.  Doc. 49 at 9.  In the petition, he cited the Second Circuit's decision in *Walker v. Girdlich*, 410 F.3d 120 (2d Cir. 2005), and in the updated briefing he cited the First Circuit's decision in *Porter v. Coyne-Fague*, 35 F.4th 68 (1st Cir. 2022).  Both decisions are materially distinguishable.

In *Walker*, the prosecutor plainly stated, "one of the main things I had a problem with was that this is an individual who was a Black man with no kids and no family."  410 F.3d at 121–22.  As the Second Circuit found, "the prosecutor's words and phrasing adduce [the juror's race and lack of family] as grounds for the peremptory challenge rather than as an incidental description[.]"  *Id*. at 124.  In other words, unlike here, the prosecutor's remark very specifically identified the race of the juror as a "main problem."  Nor could the prosecutor's racial remark in *Walker* reasonably have been interpreted as prefatory or part of a predicate of identification in which the prosecutor mentioned the race and gender of all jurors, black and white, when providing reasons for her strikes.

43

In *Porter*, the prosecutor, unprompted, explained that he struck the only black veniremember in the panel essentially because he disbelieved the veniremember's testimony that potential "blow-back" he might receive at his job would not affect his ability to serve impartially, and, furthermore, the prosecutor believed that any such "blow-back" would accompany only a guilty verdict.  35 F.4th at 72.  Crucially, the prosecutor oriented his concern about the juror's fear of repercussions in the shared race of the veniremember and the defendant:  "Essentially, what he was saying is that—and, again, this is the State's take—he's a member of the African-American community, the defendant at the bar is a member of the African-American community, he's the only one on the panel who is, and if he were to vote guilty there could be consequences to it."  *Id*.

In *Porter*, unlike here, the mention of the veniremember's race and the racial comparison invoked by the prosecutor was not prefatory in nature.  Rather, it occurred in the middle of the prosecutor's explanation of his reason for the strike, and, as found by the First Circuit, it was offered as a way of explaining and amplifying the rationale the prosecutor was attempting to provide: "[T]he record shows that the prosecutor's racial observation underpinned the chief reason given for the strike: the assumption that Juror 103 was predisposed against a guilty verdict in particular." *Id*. 80–81.

44

Here, by contrast, Brooks's mention of Davis's race and her comparison of the race of Davis and petitioner plainly had nothing to do with the proffered reasons for her strike. Brooks did not offer Davis's race, or his racial affinity with petitioner, as "underpinning" for her concern that Davis was unduly vague in his voir dire responses about pretrial publicity. In short, Brooks's racial remarks were either, as petitioner has argued, a separate and independent reason for her strike, *i.e.*, the real reason, or, as found by the ASC, something else. Because Brooks's racial remarks cannot reasonably be read as amplification or support for a putative race-neutral reason for her strike, *Porter* does not advance petitioner's claim that the ASC based its decision upon an unreasonable determination of fact.

So, allowing that a prosecutor may *reference* a juror's race without dooming her defense of striking that juror, it is easy to conclude that the ASC did not unreasonably find that Brooks's mere reference to Davis's race was not a reason for her strike of Davis. Brooks's further comparison of the race, sex, and age of Davis and petitioner is, of course, more problematic. Petitioner has argued that the ASC failed to engage with his claim that Brooks's comparison of the race of Davis and petitioner demonstrates her racial animus. *See* Doc. 26 at 12. This is a fair point. The ASC addressed Brooks's reference to Davis as a black male and reasonably concluded that it was a descriptive identification consistent with Brooks's practice

45

of noting the race and gender of other jurors, black and white, that were struck by both parties. The ASC had little to say, however, about Brooks's racial comparison except to characterize it as a "mention of Sockwell's race" that was "part of the same predicate of identification that she mentioned for all the veniremembers that she had struck." 675 So. 2d at 41. This explanation is not persuasive. Brooks's "mention" of petitioner's race while explaining the Davis strike is the only time in the transcript that Brooks mentioned petitioner's race and, more concerning, is the only time she compared the race of a juror with that of petitioner.

The question for this court, however, is not whether it agrees with the ASC. The question, instead, is whether the ASC reasonably reached its decision. This inquiry entails considering any potential justification that supports the ASC's ultimate decision, including those not explicated by the ASC. As set forth above, the ASC reasonably could, and did, determine that, viewing the record holistically, Brooks's racial remarks, including her racial comparison, were not reasons for her strike of Davis. While the record offers support for a contrary conclusion, it does not dictate that only the contrary conclusion is reasonable. The record does not render unreasonable a conclusion that Brooks's racial comparison was incidental, surplusage, or simply an extemporaneous, if ill-advised, descriptive observation that Davis and petitioner were of the same race, sex, *and* age, but that this observation

46

conveyed no particular animus toward any of those traits.[7]  Under the deferential regime of AEDPA that controls here, and in the absence of any contemporaneous follow-up by defense counsel, that is all that is required to sustain the ASC's factfinding.

Finally, the record does not establish that, even if Brooks's racial comparison demonstrates some untoward racial consciousness in her strike of Davis, and that the ASC erred in finding otherwise, the ASC's ultimate decision denying the *Batson* claim was unreasonable.  This is so because, as a matter of clearly established federal law at the time of the ASC's decision, which is what this court is charged with applying while reviewing the ASC's decision, nothing in *Batson* prohibited the ASC from considering whether, even if Brooks was motivated in part by race, she still would have struck Davis for race-neutral reasons.

---

[7] And, to the extent Brooks's comparison of the identity traits of Davis and petitioner should be construed as a reason for the strike, their similarity in age cannot be extracted from that inquiry.  A juror's closeness in age to the defendant can be a legitimate, non-discriminatory reason for exercising a strike.  *See McNair v. Campbell*, 307 F. Supp. 2d 1277, 1300 (M.D. Ala. 2004) (denying *Batson* claim challenging the prosecutor's strike of four black potential jurors due to their closeness in age to the defendant), *aff'd in part and rev'd in part*, 416 F.3d 1291, 1312–13 (11th Cir. 2005) (affirming denial of *Batson* claim). If Brooks's comparison is treated as a reason for her strike, it was incumbent on petitioner to prove to the state courts that Davis's age was not the identity trait that motivated Brooks to strike Davis, and it is incumbent on him to prove to this court that the ASC could not have reasonably concluded that Davis's age, rather than his race or sex, was the actual reason for the strike.

As observed by the ACCA, *Batson* itself states that the Equal Protection Clause "forbids the prosecutor to challenge potential jurors *solely* on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."   476 U.S. at 89 (emphasis supplied).   The Supreme Court repeated this formulation in a holding issued after *Batson* but prior to the ASC's decision on petitioner's appeal.   *See Powers v. Ohio*, 499 U.S. 400, 409 (1991) ("We hold that the Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury *solely* by reason of their race[.]") (emphasis supplied).

Taking account of this holding, some federal appellate courts, including the Eleventh Circuit, adopted a "dual motivation analysis" to test whether a *Batson* violation occurs when the prosecutor considers race along with race-neutral reasons when exercising a peremptory challenge.   *See, e.g., Wallace v. Morrison*, 87 F.3d 1271, 1274 (11th Cir. 1996).

> Under dual motivation analysis, after the party raising the *Batson* claim has established a prima facie case that discrimination was a substantial part of the motivation for a strike, the party who exercised the strike may raise the affirmative defense that the strike would have been exercised solely for race-neutral reasons. The party accused of discrimination bears the burden of showing by a preponderance of the evidence that the strike would have been exercised in the absence of any discriminatory motivation.

*Id*. at 1274–75.[8]

To be sure, the ASC disavowed any dual motivation analysis in its decision, holding that prior ACCA authority "cannot be read to suggest that a non-race-neutral *reason* given for a peremptory strike will 'cancel out' a race-based reason[.]" *Ex parte Sockwell*, 675 So. 2d at 41 (emphasis in *Sockwell*). Although the ASC thus disagreed with the "inference that a peremptory strike may be upheld if it is based only *partly* on race[,]" *id*. at 40, clearly established federal law at the time of the ASC's decision did not preclude it from evaluating the record to determine whether, notwithstanding Brooks's consideration of race, she still would have struck Davis absent any consideration of his race.

For the reasons that will be discussed more fully below—namely, the legitimacy of Brooks's race-neutral reasons for the Davis strike—the record before

---

[8] In *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008), issued more than a dozen years after the ASC's decision in petitioner's appeal, the Supreme Court declined to clarify whether "dual motivation analysis" comports with *Batson*:

> In other circumstances, we have held that, once it is shown that a discriminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985). We have not previously applied this rule in a *Batson* case, and we need not decide here whether that standard governs in this context. For present purposes, it is enough to recognize that a peremptory strike shown to have been motivated in substantial part by discriminatory intent could not be sustained based on any lesser showing by the prosecution.

the ASC reasonably supports the conclusion that, under a dual motivation analysis, even if Brooks considered Davis's race while striking him, Brooks did not violate *Batson* because Davis's race was not a substantial motivation, much less the "sole" reason, for her strike.  Accordingly, the ASC's ultimate disposition is justified even if it erroneously decided that Brooks gave a race-based reason for the Davis strike.

   ii. *The ASC did not unreasonably apply* Batson *by failing to conduct* Batson*'s third step.*

   Petitioner next alleges that the ASC unreasonably applied *Batson* because it failed to conduct *Batson*'s third step and determine whether he established purposeful discrimination respecting the Davis strike.  Pet. ¶ 57.  In support, he argues that the ASC "stopped immediately after step 2" when it deferred to the trial court's finding that Brooks's stated reasons for the Davis strike were race neutral.  *Id*. at ¶ 58.  He claims that the ASC "did not even *purport* to consider *any*" of the relevance circumstances informing his claim of *Batson* error, as is required by *Batson*.  *Id*. at ¶ 59 (emphasis in original).  He also asserts that the ASC could not have implicitly considered the relevant circumstances at *Batson*'s third step because the ASC "explicitly" closed its analysis at step two with respect to the Davis strike but went on to perform a step three analysis with respect to the prosecutor's strikes of other veniremembers.  *Id*. at ¶ 60.  He specifically faults the ASC for failing to consider the following relevant circumstances in its decision: a) the prosecutor's

disproportionate exclusion of blacks from the venire; b) Brook's history of *Batson* violations, as reflected in state court appellate opinions; and c) the pretextual nature of Brooks's race-neutral reasons for the Davis strike. *Id*. at ¶¶ 62–68.

As discussed previously, under *Batson*, "[t]he trial court must consider all relevant circumstances at the third step[.]" *King*, 69 F.4th at 868. *Batson* does not, however, impose any particular opinion writing requirement on the state court in order for its decision to receive AEDPA deference:

> When a court considers a *Batson* claim in an appeal or a state habeas proceeding, the state court's written opinion is not required to mention every relevant fact or argument for its merits determination to receive deference on review by a federal court. Instead, the petitioner must prove that the state court failed to consider that argument or fact.

*Id.* (quotations and citations omitted). This is so even where the state appellate court does not "explicitly mention[] *Batson*'s third step" and makes "no explicit findings about the prosecutor's credibility or about discriminatory purpose, or anything at all relating to that step." *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1215–16 (11th Cir. 2013). In such circumstances, federal courts may make a "common sense judgment" that a state court's rejection of a *Batson* claim following the state's proffer of race-neutral reasons represents an implicit finding that the state's explanations are credible and, accordingly, completes step three of *Batson*. *Id*. at 1216–17. *See also Hightower v. Terry*, 459 F.3d 1067,1072 n.9 (11th Cir. 2006).

Here, petitioner cannot surmount *King*'s directive that he prove that the ASC failed to consider the facts and circumstances he raised before that court. While he correctly argues that the ASC offered no explicit reference to those circumstances in its discussion of the Davis strike, the above authorities relieve the ASC of any such requirement. *King*, 69 F.4th at 869 ("A petitioner must do more than prove that the state court failed to 'mention' evidence in order to prove that the state court failed to consider that evidence."). More to the point, he parses the ASC's opinion too finely for AEDPA purposes. For example, while petitioner accuses the ASC of closing its analysis of the Davis strike after step two, a fair reading of the opinion does not require that conclusion. To be sure, the thrust of the ASC's opinion regarding the Davis strike was to convey its conclusion that the ACCA's factfinding was flawed, as outlined above. But nothing in the opinion unambiguously confirms that the ASC did not implicitly consider petitioner's other arguments regarding the Davis strike. *Id.* ("Nothing in the Supreme Court of Georgia's opinion suggests that it did not consider [relevant circumstances raised by King] . . . , so we must presume that the court did consider the circumstances King cites.").

Indeed, the opinion can fairly be read to proceed beyond step two of *Batson* for at least two reasons. *First*, at the close of the step three analysis that petitioner concedes the ASC performed respecting the strikes of four other black

52

veniremembers, the ASC remarked as follows: "After carefully reviewing the record as it relates to the prosecutor's peremptory strikes, we must conclude that it does not establish that the prosecutor engaged in disparate treatment in the striking of black persons and the striking of white persons." *Ex parte Sockwell*, 675 So. 2d at 42. This passage connotes no limitation to only the four black veniremembers that the ASC discussed in the previous paragraphs. In referring broadly to "the record" of the "prosecutor's peremptory strikes," and finding no "disparate treatment in the striking of black persons and the striking of white persons," the opinion fairly suggests that the ASC considered all of the record, including that pertaining to Davis, when it found no disparate treatment in the striking of black and white veniremembers.

*Second*, in concluding its opinion, the ASC noted that petitioner had raised issues "that either were not before the Court of Criminal Appeals *or were not addressed in its opinion*." *Id*. (emphasis supplied).[9] The ASC plainly stated that it "thoroughly considered each issue Sockwell has raised . . . [and] independently

---

[9] Petitioner also accuses the ACCA of failing to conduct *Batson*'s step three analysis regarding the Davis strike because its opinion is devoid of a positive indication that it did so. *See* Pet. ¶ 58.

searched the record for reversible error, considering the applicable law as it relates to the facts of the case, and have found none." *Id*.[10]

Where the ASC thus explicitly professed to have "thoroughly considered" and rejected all issues that were raised by petitioner, including those not mentioned in the ACCA's opinion, which necessarily includes petitioner's arguments about step three of *Batson* as it relates to the Davis strike, petitioner cannot meet his burden of proving that the ASC did not consider the relevant circumstances he faults the ASC for failing to mention in its opinion.  Instead, the governing principles of AEDPA require this court to treat the ASC's decision as having implicitly considered, and rejected, the arguments petitioner raised before that court, notwithstanding the ASC's failure to address those arguments in its opinion.  Accordingly, this court cannot conclude that the ASC unreasonably applied *Batson* by failing to conduct step three of the *Batson* analysis.

> iii.   *The ASC's implicit step three analysis did not unreasonably apply* Batson *and was not based upon an unreasonable determination of the facts before the ASC.*

Petitioner's final contention in support of his *Batson* claim is that any implicit *Batson* step three determination by the ASC constituted an unreasonable application

---

[10] Petitioner's brief in support of his petition for certiorari in the ASC raised, among other circumstances, his claim that Brooks's race-neutral reasons for the Davis strike were pretextual.  *See* Doc. 14-12 at 48-50.

of *Batson*, or was based upon an unreasonable determination of the facts by the ASC, because all the relevant circumstances before the ASC "overwhelmingly demonstrated discriminatory intent."  Pet. ¶ 61.  As set forth in the petition, and as discussed previously, those circumstances include Brooks's disproportionate strikes of black veniremembers at petitioner's trial, her record of *Batson* violations, and the pretextual character of her race-neutral reasons for striking Davis.

Regarding the first of these circumstances, it is evident that Brooks disproportionately struck black veniremembers at petitioner's trial.  As discussed previously, she used eight of her fifteen peremptory challenges to remove eight of ten eligible black veniremembers.  Petitioner's updated briefing capably illustrates that Brooks's "challenge rate" for black veniremembers "was more than triple the rate for white jurors" and the "exclusion rate for black jurors (80%) was almost quadruple the rate for white jurors (21.9%)."  Doc. 49 at 15.  Although Brooks's disproportionate strikes of black veniremembers was not expressed to the ASC in terms of "challenge rate" and "exclusion rate," the core statistics from which these rates are derived were before the ASC, which noted in its opinion that Brooks peremptorily struck eight of ten black veniremembers.  *See* 675 So. 2d at 40.  Brooks's disproportionate exclusion of black veniremembers is a relevant

circumstance probative of petitioner's *Batson* claim that the ASC was required to consider. *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 240–41 (2005).

It is also evident that, regarding the second relevant circumstance identified by petitioner, around the time of his trial, several convictions secured by Brooks were reversed due to her discriminatory exclusion of black veniremembers. The petition cites five state court appellate decisions issued from 1988 through 1992 in which convictions secured by Brooks were reversed on *Batson* grounds. Pet. ¶ 64. Brooks's *Batson* history is also a relevant circumstance probative of petitioner's *Batson* claim that the ASC was required to consider. *See, e.g., Miller-El*, 545 U.S. at 266; *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019).

Brooks's disproportionate strikes and history of *Batson* violations only go so far, though. Petitioner still must show that Brooks discriminated against Davis based upon his race. The Eleventh Circuit's recent *King* decision is instructive on this point. There, the prosecutor used seven of his ten peremptory strikes to remove seven of the eight eligible black veniremembers in a pool of forty-two potential jurors. 69 F.4th at 863. In addition, the prosecutor in *King* was found by the trial court to have violated *Batson* with one of his seven peremptory challenges. *Id*. When the trial court made this ruling, the prosecutor launched into a "'soliloquy'"

in which he disparaged *Batson* and complained about its effects on criminal trial practice. *Id*. at 863–64.

The Court of Appeals in *King* was therefore faced with what it conceded was a "troubling" record: the prosecutor employed a plainly disproportionate pattern of peremptory strikes, was openly hostile to *Batson*, and, indeed, was found to have violated *Batson* at the underlying trial.   *Id*. at 868.   Nevertheless, the Court of Appeals rejected King's *Batson* claim because, examining each of the challenged strikes individually, the Court of Appeals could find no instance in which the Supreme Court of Georgia unreasonably adjudicated the facts regarding the prosecutor's peremptory challenges. *Id*. at 870–73.  So, disproportionate strikes and a problematic *Batson* history, while similarly "troubling," cannot carry the day for petitioner.  He still must show that the ASC unreasonably adjudicated the facts in its rejection of his Davis *Batson* claim.

Petitioner "faces a high hurdle at this stage." *King*, 69 F.4th at 870.  He must provide clear and convincing evidence that the ASC erroneously credited Brooks's race-neutral reasons for her strike of Davis.  He cites two reasons why the ASC unreasonably adjudicated the facts: Brooks's race-neutral reasons are not supported by the record and the rationale she articulated applied equally to white

veniremembers she did not strike.  Pet. ¶¶ 66–68.  The court will consider each argument in turn.

On the first point, the ASC did not unreasonably adjudicate the facts when it found credible Brooks's assertion that Davis was "extremely vague" in his voir dire testimony about his exposure to pretrial publicity.  In general, a juror's difficulty in answering questions, especially on an important topic like bias due to pretrial publicity or the juror's feelings about capital punishment, is a legitimate, race-neutral reason for a peremptory challenge of the juror.  *See Atwater v. Crosby*, 451 F.3d 799, 807 (11th Cir. 2006).  Davis's testimony, previously reproduced in full, supports Brooks's charge because it demonstrates the considerable difficulty faced by the trial court in securing clear answers to the rudimentary questions of what, specifically, Davis knew about the case from his pretrial exposure to publicity and from what source he learned his information.

As Brooks observed under questioning by Wise, Davis kept saying that he had "heard something" about the case, including about the guilt of petitioner, but appeared to be unable, or unwilling, to articulate what he had heard.  When the trial court first asked Davis to provide specifics of what he had heard, he was vague, if not evasive: "Oh, I just, um, it was something in the newspaper or something."  R. at 341.  After the trial court clarified that Davis had heard from others who read the

newspaper, rather than reading it himself, the trial court asked Davis if he remembered what he had heard. Again, Davis was vague: "Not exactly." When the trial court finally cornered Davis on the question of what, specifically, he had heard, Davis still was inherently vague: "Um, the only thing I recall is just, you know, um, listening at some of the guys, you know, that said they had read about it, you know, the incident out on Troy Highway, stuff like that, you know, what had happened and so forth, you know." R. at 342.[11]

In short, Davis was presented with many natural opportunities to clearly state that he had heard mention of the case from others but that he could not remember anything specific about what he had heard. Many other jurors expressed similar sentiments plainly, without the need of an extended, unsatisfying colloquy. Instead, he persisted in failing to explain the "something" that he had heard or simply stating that he could not remember what the "something" was.

Brooks was unsure whether Davis's difficulty with answering the judge's questions was because Davis "didn't understand the Judge or if he just didn't want

---

[11] Even this answer by Davis appears unresponsive to the question of what, specifically, he had heard from others before trial. Before conducting individual voir dire, the trial court informed the venire that the trial concerned "the accusation that the defendant shot Isaiah Harris . . . near the Troy Highway, in the head with a shotgun . . . in exchange for money allegedly paid to him by Mr. Harris' wife, Louise Harris, by her boyfriend." R. at 168. So, Davis revealed nothing about what he had "heard" from his pretrial sources that he would not have already learned in court that morning.

to talk about it or wasn't interested," R. at 428, but her abiding concern about Davis's vagueness is amply supported by the transcript. No doubt, there may be an innocuous explanation for Davis's vagueness, including the one offered by Brooks, that perhaps Davis did not understand the judge's questions. But Brooks reasonably found Davis's vague testimony peculiar, and she reasonably could have inferred that he was being less than forthright about his exposure to pretrial publicity. Consequently, the ASC did not unreasonably adjudicate the facts to the extent it implicitly found credible Brooks's claim that Davis was struck because of his vagueness.

Petitioner's second point—that Brooks did not strike white jurors who were similarly vague as was Davis—fares no better because the only white jurors he identified as comparators in his briefing to the ASC, Lisa Burch and Peggy McFarlin, were not similarly vague. As recounted in the petition, *see* Pet. ¶ 68, both of these jurors acknowledged having previously heard about the case. Burch testified that she "briefly" "heard it on the news." R. at 273. Unlike Davis, who at first testified that he had "heard something" about whether petitioner was guilty or not, Burch unequivocally answered "no" to the same question. *Id*. Burch was forthright about her inability to "remember in full detail what [she] heard" from the news. R. at 274. Her answers did not repeatedly and obliquely hint that she had

heard "something" that she appeared reticent to reveal.  Although, like Davis, she ultimately could not remember what she had heard about the case on the news, it is evident that her testimony was not "vague" in the same sense as was that of Davis.

McFarlin, too, was unlike Davis.  She unequivocally stated that she had learned about the case "[i]n the paper."  R. at 319.  Unlike Davis, who, again, at first claimed to have heard "something" about whether petitioner was guilty or not, McFarlin could not remember if she had heard any such information.  *Id*.  She was clear that she could "barely remember the story" and did not "remember how it ended."  *Id*.  She had only "read a little bit of it in the paper and [she didn't] know what [petitioner had] done."  *Id*.  Nothing in McFarlin's testimony, unlike with Davis, was vague or suggestive of an effort not to reveal what she knew about the case.

While it can fairly be said that Davis, McFarlin, and Burch were alike in that, ostensibly, they remembered little of what they had heard or read about the case before trial, that is where the similarities end.  Davis's voir dire testimony is characterized by the trial court's protracted effort to get Davis to clearly state what he had heard about the case before coming to court.  After many fits and starts, it ended pretty much where it began: Davis had heard "something" but it still was unclear what that "something" was.  Burch and McFarlin were upfront and clear that

they had consumed earlier media reports about the case, but that they could not remember specifics from those reports. The ASC's decision that Brooks's vagueness rationale for the Davis strike did not apply equally to Burch and McFarlin was not an unreasonable determination of the facts based upon the record before the ASC.

For all of the foregoing reasons, the ASC did not unreasonably apply *Batson*, and its decision denying petitioner's *Batson* claim was not based upon an unreasonable determination of fact. Accordingly, Claim One is due to be denied.

### 2.   Claim Two

Claim Two is petitioner's claim that the trial court violated his Sixth and Fourteenth Amendment right to present witnesses in his defense by permitting Louise Harris to invoke her Fifth Amendment privilege against self-incrimination and refuse to answer questions at his trial. As stated previously, this claim was not presented to the ACCA on direct appeal of petitioner's conviction and sentence, but was summarily denied on the merits by the ASC in its opinion affirming petitioner's conviction. Thus, there is no reasoned state court appellate decision denying the claim. Nevertheless, this court still must determine whether the ASC's summary decision is "contrary to, or involved an unreasonable application of, clearly established Federal law" or is "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." § 2254(d)(1) & (2). To resolve this question, this court "must determine what arguments or theories supported, or . . . could have supported, the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court. *Harrington*, 562 U.S. at 102.

### a.    *Clearly Established Federal Law*

Two important constitutional rights are germane to petitioner's claim. The Fifth Amendment to the U.S. Constitution declares in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. The Sixth Amendment establishes the right of a criminal defendant "to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. Petitioner's claim is about how state courts are to resolve the conflict when presented with competing assertions of these two fundamental rights.

Petitioner cites *Washington v. Texas*, 388 U.S. 14 (1967), as the generally applicable clearly established federal law outlining his Sixth Amendment right to present witnesses in his defense. There, a criminal defendant challenged on Sixth Amendment grounds Texas statutes under which "persons charged or convicted as coparticipants in the same crime could not testify for one another." *Id*. at 16. The

Supreme Court held that the Sixth Amendment right of compulsory process is applicable to the States under the Fourteenth Amendment and that the Texas statues at issue infringed the Sixth Amendment because they permitted the State to arbitrarily deny the accused's "right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id*. at 19, 23.

*Washington* described the importance of the protection afforded by the Sixth Amendment's compulsory process clause:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies.

*Id.* at 19. The right recognized in *Washington* is not absolute, however. In particular, as observed by petitioner, the "defendant's right to call witnesses on his behalf can be overcome by the witness's invocation of the Fifth Amendment privilege against self-incrimination, if that invocation is legitimate." Pet. ¶ 80 (citing *Washington*, 388 U.S. at 23 n.21) (emphasis removed). Indeed, "the Fifth Amendment privilege against compulsory self-incrimination" is "the most important" exemption to a defendant's Sixth Amendment right to compel testimony. *Kastigar v. United States*, 406 U.S. 441, 444 (1972).

As the Supreme Court stated in *Kastigar*, the Fifth Amendment privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id*. at 444–45 (citations omitted). The question, then, is how a court is to determine when a witness's invocation of his or her Fifth Amendment privilege is reasonable such that it may overcome a defendant's right to present the witness's testimony.

Petitioner cites *Hoffman v. United States*, 341 U.S. 479 (1951), as the clearly established federal law governing the determination of whether a witness has "validly asserted the privilege against self-incrimination." *See* Pet. ¶¶ 80–81. *Hoffman* involved a grand jury witness, Samuel Hoffman, who was "convicted of criminal contempt for refusing to obey a federal court order requiring him to answer certain questions asked in a grand jury investigation." 341 U.S. at 480. "It was stipulated that [Hoffman] declined to answer on the ground that his answers might tend to incriminate him of a federal offense." *Id*. at 482.

The Supreme Court first explained that the privilege extends not just to "answers that would support a conviction[,]" but also to "those which would furnish a link in the chain of evidence needed to prosecute" the witness invoking the

65

privilege.  341 U.S. at 486.  The Court emphasized, however, that the Fifth Amendment privilege's "protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Id*. *Hoffman* places the onus on the court to ascertain whether a witness's invocation of the privilege is reasonable.

> The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination.  It is for the court to say whether his silence is justified, and to require him to answer if it clearly appears to the court that he is mistaken.  . . .  To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Id.* at 486–87 (citations omitted).  Importantly, in assessing the validity of a witness's invocation of his or her Fifth Amendment privilege, the presiding judge "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *Id*. at 487 (citation and quotation omitted).

### b.    *Proceedings in the Trial Court*

The defense subpoenaed Louise Harris to testify in the guilt phase at petitioner's trial.  As related in the petition, the defense intended to have Harris essentially replicate the testimony she gave in her own defense at her previous trial.  Pet. ¶ 76.  That testimony—that she gave money to McCarter to pay petitioner for a

66

car repair, not to kill her husband—was exculpatory as to Harris and, by extension, petitioner. The defense and the trial court quickly learned, however, that Harris did not intend to offer such testimony at petitioner's trial. While the trial court was conducting individual voir dire of potential jurors, Harris's attorney, Bryan Stevenson, addressed the court and apprised it of Harris's intentions:

> Judge Thomas, I'm Bryan Stephenson. I represent Louise Harris, and she was brought over here today to testify, I think on a subpoena issued by the defense. She is not willing to testify and would assert her Fifth Amendment right. And I was just wondering if we could have her sent back to Tutwiler. I don't know if there's an Order from the Court.

R. at 190.

The trial judge asked the defense if it wanted to put Harris on the stand to assert her Fifth Amendment right. The defense answered affirmatively and further argued that Harris should be made to do so before the jury. R. at 191. The defense also asserted that Harris had waived her Fifth Amendment privilege by testifying at her previous trial, which resulted in a conviction and death sentence. The defense recognized, however, the practical limitations of the court's ability to compel Harris to answer questions:

> She has, in our opinion, waived her Fifth Amendment Right by her previous testimony, but irrespective of that, she hasn't got to testify if she don't want to by other grounds, but I want the jury to hear her invoke her Fifth Amendment Right.
> . . .

> I don't think she has one to begin with, but if she refuses all you can do
> is put her in jail and she's there already.

R. at 191–92.  With that, the trial judge requested that Stevenson make himself

available when the defense called Harris to the stand and proceeded with individual

voir dire.

The issue was revisited during trial when the prosecution moved *in limine* to

prevent the defense from calling Harris to the stand knowing her intent to assert her

Fifth Amendment privilege in front of the jury.  R. at 773.  Brooks argued that the

defense should not be permitted to "call a witness merely to prejudice the jury."  R.

at 773.  The following exchange occurred:

> [Defense attorney] MR. WOOD:  Well, your Honor, we expect to
> call Louise Harris. She testified in her own defense, and we have no
> reason to believe, other than Bryant [sic] Stevenson said she was
> going to invoke the Fifth in your Honor's presence.  We'd like to
> have her come and do that.  Our position is as we told you, is that
> she waived any such privilege having testified.  If she takes that
> position I think in light of the fact that Michael Sockwell is accused
> with her in this case we ought to be able to read portions of her
> testimony from the prior trial.  She's waived it.  I certainly have a
> right to call her and see if that's what she does.
>
> MS. BROOKS:  Your Honor, the case of Douglas [ v. Alabama]
> speaks to that, and it says that if you waive your Fifth Amendment
> Right for one trial you do not automatically waive it for subsequent
> trials when your own case is on appeal, as hers clearly is. We would
> suggest to the Court – and I don't dispute if the defense says this –
> if they have no reason to believe that the witness will take the Fifth
> then we ask for an out of presence hearing from the witness on
> whether or not he or she intends to take the Fifth Amendment.  If he

or she does then we're all on notice and there won't be any prejudice.  If they say they don't, then of course our motion is improper.

. . .

THE COURT:  They probably could, even if the law is [sic] that she can claim the Fifth[,] I think they would probably be able to introduce her testimony.

MS. BROOKS:  Judge, we considered that as well, and because the parties were different and the issues are different as to the involvement of Michael Sockwell and it was State versus Louise Harris, not Michael Sockwell that she testified before and the attorneys were different, we don't think it would have been admissible, just like Mr. McCarter's testimony is not in and of itself admissible right now.

. . .

MR. WOOD:  Your Honor, . . . we believe that the denial to this defendant of the right to call Louise Harris .  .  .  will be a violation of his right under the United States Constitution Amendments Five, Six, Eight, Nine, and Fourteen, as applied to the States and under Constitution of Alabama Article One Section Six.  Now, that's especially true where this jury has already heard, as I pointed out earlier, under a conspiracy theory, all kinds of stuff from officers about what Bobo said or about what Louise said.  We have a right to call them.  If they take the Fifth then let 'em take the Fifth, but this defendant is prejudiced if we don't get that opportunity, and I believe that this Court, even under Douglas, is subject to being reversed on that point alone.

MS. BROOKS:  Judge, our position is not that they don't have a right to call, but it should be done out of the presence of the jury to determine whether or not the witness will take the Fifth.  If the witness indicates that he or she will then the witness is being called not to solicit testimony, but to prejudice the jury, which is clearly improper.

MR. WOOD:  Your Honor, the converse of that is true.  If we don't call them and if the jury is not aware of an attempt to call them then

69

we're prejudiced by it.  We're prejudiced in that we don't try to show anything different from what they've already been told that these officers say they said.

.  .  .

THE COURT:  Okay.  I've got two questions before me.  One, can you call them and see if they're going to plead the Fifth and how that's done, whether it's done out of the presence of the jury or before, and the other question is . . . whether or not if the plead the Fifth, some testimony that was illicited [sic] in a prior trial could be admissible here.

MR. WISE:  Your Honor, I think there's a further question, if I could say it.  .  .  .  Mrs. Harris does not have the right to take the Fifth Amendment unless it would incriminate her.  We can ask her her name, we can ask her where she lives, we can ask her if she was the wife of one Isaiah Harris.  Those types of questions and others which are relevant to this case and admissible she does not have Fifth Amendment Right as to the answers those questions would invoke.

THE COURT:  You're saying a defendant wouldn't have the right just not to just answer who she was or - -

MR. WISE:  No, sir, that's not incriminating.  Who she is is not incriminating.  She has no Fifth Amendment right.  It is on her birth certificate, it's on her tax returns, it is on her Social Security records.  Those are all public records.

THE COURT:  I thought a defendant has a right not to do anything.

MR. WISE:  No, sir, not unless it would incriminate them.

.  .  .

THE COURT:  I'm ready to rule on the fact whether or not you can call 'em.  I think you can call 'em and they'd have the take their Fifth Amendment with the jury here.  Now the next question is what happens if they do.

MR. WOOD:  I think I can't go any further than when they take the Fifth.  I stop.  Now, I'm asking you in the matter of Harris to

consider the question of whether or not I can use the transcript or portions of it from her - - I understand the State would have the right to any portion of it for themselves.  I'm not satisfied with everything in the testimony from her prior trial.

THE COURT:  All right.  Well let's get started.  Show the jury out and we'll make rulings as we go.

R. at 774–85.

When the defense called Harris to the stand, the following exchange occurred:

BY MR. WOOD:

Q.     Ms. Harris, I'm Jerry Wood and I'm one of the lawyers for Michael Sockwell.  Where are you presently incarcerated?

A.     Julia Tutwiler Prison for Women.

Q.     And what is the charge - - what is the basis for your being there?  Why are you there?

MR. STEVENSON:  Your Honor, at this point, for the record, I'm Bryant [sic] Stevenson counsel for Ms. Harris.  Ms. Harris has indicated her desire to assert her Fifth Amendment Right in these proceedings and refuses to answer any and all questions relevant to this case based on her Fifth Amendment Right, and at this point I would invoke that Right on her behalf and ask that she be subject to no further questioning.

MR. WOOD:        I'll respect that, your Honor.

THE COURT:        Grant that motion.

MS. BROOKS:        No questions from the State, your Honor.

THE COURT:        You may step down.

R. at 812–13.

### c.      *State Court Appellate Review*

As discussed previously, petitioner did not raise a federal constitutional claim regarding the trial court's handling of Harris's invocation of her Fifth Amendment privilege on direct appeal to the ACCA.  Petitioner first raised the claim in his brief in support of his petition for certiorari to the ASC.  *See* Doc. 14-12 at 77–90. Specifically, he argued that the trial court erred in accepting Harris's invocation of her Fifth Amendment privilege because Harris waived the privilege when she testified at her own trial and, furthermore, because Harris had already been convicted and sentenced at the time of petitioner's trial.  In relevant part, he also argued that the trial court erred because "there was no showing that [Harris's] answers to defense counsel's questions would have a tendency to incriminate her."  *Id*. at 89.

The ASC did not address petitioner's arguments in its decision affirming his conviction and sentence.  Instead, after stating that it had "thoroughly considered" all issues petitioner raised, it found no reversible error and, accordingly, summarily denied the claim.  *Ex parte Sockwell*, 675 So. 2d at 42.

### d.    *Petitioner's Arguments Pursuant to § 2254(d)(1)*

Petitioner alleges that, pursuant to § 2254(d)(1), the ASC's summary denial of his claim unreasonably applied clearly established federal law because it failed to conclude that the trial court violated petitioner's Sixth Amendment right to compulsory process by 1) failing to conduct an inquiry into the validity of Harris's invocation of her Fifth Amendment privilege; and 2) failing to conclude that Harris "had no legitimate claim to Fifth Amendment protection with respect to the testimony that Mr. Sockwell sought to elicit." Pet. ¶ 84.  He also alleges that any implicit decision by the ASC that any error by the trial court was harmless also unreasonably applied clearly established federal law because Harris's testimony "could well have created a reasonable doubt that Mr. Sockwell was guilty of any murder, let alone of capital murder." *Id*. at ¶¶ 85–89.

### e.    *Application*

Claim Two is due to be denied for at least four reasons: i) the ASC did not unreasonably apply clearly established federal law because, at the time the ASC issued its decision, there was no Supreme Court holding clearly establishing the procedure a state court is to follow when balancing a criminal defendant's Sixth Amendment compulsory process rights against a witness's invocation of her Fifth Amendment privilege; ii) the ASC did not unreasonably apply the clearly established

federal law that petitioner has identified as governing his claim; iii) the ASC reasonably could have concluded that any error committed by the trial court as described in Claim Two was harmless; and iv) any error committed by the trial court was harmless pursuant to *Brecht*.

> i.     Petitioner has not identified applicable clearly established federal law that the ASC could have unreasonably applied.

The petition identifies two Supreme Court decisions as reciting the clearly established principles of federal law that, petitioner alleges, the ASC unreasonably applied: *Washington v. Texas* and *Hoffman v. United States*. *See* Pet. ¶¶ 79, 81. Both of these decisions are inapposite.

As discussed previously, *Washington* involved a criminal defendant's challenge to state statutes that prevented him from presenting accomplice testimony in his own defense. The Supreme Court concluded that the state statutes violated the Sixth Amendment because they permitted the State to "arbitrarily" deny the accused's "right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." 388 U.S. at 19, 23. In *Hoffman*, as also noted previously, a grand jury witness convicted of criminal contempt challenged his conviction on Fifth Amendment grounds, arguing that his privilege against self-incrimination protected his refusal to answer certain questions

74

before the grand jury.  Neither decision addressed the standards to be applied and the procedure to be followed when a trial court is confronted with a defense witness's invocation of her Fifth Amendment privilege at a criminal trial.

Petitioner therefore has pointed to no Supreme Court holding addressing the scenario his claim presented to the ASC.  He argues that he need not do so because his "right to present witnesses in his defense" is clearly established and AEDPA does not require him "to identify clearly established Supreme Court precedent demonstrating the inapplicability of an *exception* to that constitutional right."  Doc. 26 at 10 (emphasis petitioner's).  Thus, he maintains, "because no legitimate invocation of the Fifth Amendment occurred[], this case is not materially distinguishable from *Washington v. Texas*[.]"  *Id*. at 11.

Petitioner cites no case in the petition concluding that *Washington* and *Hoffman* constitute clearly established federal law binding on a state court in the factual scenario presented by Claim Two.  There is, however, persuasive federal appellate authority that runs counter to his claim.  In *Davis v. Straub*, 430 F.3d 281 (6th Cir. 2005), the Sixth Circuit rejected a habeas petitioner's similar claim that *Washington* and *Hoffman* provide a predicate of clearly established federal law that was unreasonably applied by Michigan's state courts.  Much like petitioner here, the petitioner in *Davis* argued that "*Hoffman* clearly established that witnesses must

75

invoke their Fifth Amendment privilege in response to each posed question and that *Washington* required the trial court to compel [a witness who invoked his Fifth Amendment privilege] to testify because, otherwise, Davis would have been arbitrarily deprived of his right to a fair trial." *Id*. at 288.  The Sixth Circuit rejected both contentions, concluding that "*Hoffman* and *Washington* did not clearly establish how to resolve the conflict between a witness's Fifth Amendment privilege and a defendant's right to present his defense.  Because these cases do not resolve the issue, the state courts necessarily could not have acted contrary to clearly established Supreme Court precedent." *Id*.

The Sixth Circuit found *Hoffman* inapplicable for several reasons, including the following: the Supreme Court "did not consider the relationship between the witness's privilege against self-incrimination and the defendant's right to put on his defense[;]" the decision "announced no rule proscribing the blanket assertion of the privilege against self-incrimination[;]" and the decision "clearly does not hold[] that defense witnesses must always take the stand to invoke the privilege" on a question-by-question basis.  *Id*. at 288–89.

As for *Washington*, the Sixth Circuit found that the decision "does not hold that a defendant has the right to present any and all witnesses." *Id*. at 290.  Rather, "entirely outside the Fifth Amendment self-incrimination context," *Washington*

"clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense." *Id*. "Because the Court did not consider the question of a witness's Fifth Amendment privilege against self-incrimination anywhere in its opinion, it cannot be said that the Court created clearly established law against a blanket assertion of the privilege or resolved how courts should treat the tension between the witness's and the defendant's interests." *Id*.

Because the decisions petitioner has cited in his petition, *Washington* and *Hoffman*, do not create clearly established federal law on the question of how a trial court is to reconcile the competing interests when a criminal defendant calls a witness who invokes her Fifth Amendment privilege against self-incrimination, he has failed to show that the ASC unreasonably applied clearly established federal law in its rejection of Claim Two.

> ii.   *The ASC did not unreasonably apply the authorities petitioner has posited as providing clearly established federal law governing Claim II.*

Notwithstanding the foregoing, and assuming that *Washington* and *Hoffman* do create clearly established law applicable to petitioner's claim, this court is unable to conclude that the ASC unreasonably applied those decisions. This is so because, even if the trial court failed to adequately inquire into whether Harris's invocation

of her Fifth Amendment privilege was reasonable and legitimate, the ASC reasonably could have found that petitioner's Sixth Amendment compulsory process right still was not violated.

To be sure, *Hoffman* stresses that a witness's "say-so does not of itself establish the hazard of incrimination."  341 U.S. at 486.  Rather, "it is for the court to say whether his silence is justified, and to require him to answer if it clearly appears to the court that he is mistaken."  *Id*.  In making this judgment, the trial court "must be governed as much by [its] personal perception of the peculiarities of the case as by the facts actually in evidence."  *Id*. at 487 (citation and quotation omitted). Here, the ASC reasonably could have concluded that the trial judge's "personal perception of the peculiarities of the case" plainly demonstrated that no inquiry was needed and would have been futile if attempted.  Such judgment would be amply supported by the record considering that Harris's attorney unequivocally stated that Harris would not be answering any questions relevant to the case for which petitioner was on trial, the trial court had no means of forcing Harris to answer any questions, and, recognizing this practical reality, the defense acquiesced to Harris's invocation of her Fifth Amendment privilege.

Recall that Harris's attorney advised the court during jury selection that Harris was unwilling to testify.  While adamant that Harris's invocation of her Fifth

Amendment privilege was not valid because she had waived the privilege, and that her privilege extended only to answers that might incriminate her, the defense recognized that the trial court's toolkit to force Harris to answer questions was bare: "she hasn't got to testify if she don't want to by other grounds, . . . but if she refuses all you can do is put her in jail and she's there already." R. at 191–92.  Hence, when Harris was called to the stand and her attorney intervened and stated that Harris "refuses to answer any and all questions relevant to this case based on her Fifth Amendment Right[,]" R. at 813, there was little the defense or the trial court could do to force her to testify.  Accordingly, the defense confirmed its "respect" for Harris's privilege and the trial judge excused her from the stand.  R. at 813.

Petitioner has cited no clearly established federal law that would require the trial court to ignore these obviously determinative circumstances and, *sua sponte*, force the defense to query the witness so that the trial court can make rulings, question by question, on whether the witness's invocation of her privilege is reasonable.  In the circumstances described above, such an exercise plainly would have been futile.[12]  More importantly, considering the defense's overriding request

---

[12] For a demonstration of this futility, see *Douglas v. State of Alabama*, 380 U.S. 415 (1965), which was cited by the prosecutor in arguing that Harris should be made to invoke her privilege outside the presence of the jury.  There, a previously convicted codefendant called by the State at the defendant's trial invoked his Fifth Amendment privilege and repeatedly refused to answer the State's questions even after the trial judge ruled that the codefendant "could not rely on the privilege because of his conviction and ordered him to

that Harris be made to invoke the privilege before the jury, it would have deprived the defense of the limited strategic advantage it realistically hoped to gain by placing Harris on the stand.[13]  *Hoffman* imparts no holding requiring the trial court to proceed under such circumstances and *Washington* cannot be read to hold that a trial court's failure to do so constitutes an "arbitrary" denial of a criminal defendant's Sixth Amendment right to compulsory process in his defense.  Thus, the ASC did not unreasonably apply *Hoffman* or *Washington* in its rejection of Claim Two.

> iii.   *The ASC reasonably could have concluded that any error by the trial court was harmless.*

Notwithstanding the above, the ASC also reasonably could have concluded that any error by the trial court in permitting Harris to invoke her Fifth Amendment

---

answer."  *Id*. at 416.  As will be further discussed in this order's discussion of Claim Three, *Douglas* was concerned with whether or not the defendant's Confrontation Clause rights were violated when the trial court permitted the prosecution to examine the codefendant-witness about his out-of-court statement.  For present purposes, *Douglas* illustrates the futility of trying to force a recalcitrant, already incarcerated witness—like Louise Harris— to testify over the witness's invocation of her Fifth Amendment privilege.

[13] Recall that the prosecution and defense were at odds over whether the defense could put Harris on the stand before the jury knowing her intent to invoke the Fifth Amendment.  The defense argued it was essential that she be made to invoke her privilege before the jury due to other evidence that had been admitted.  With no prospect of actually obtaining Harris's testimony, a question-by-question inquiry into the reasonableness of her invocation of the privilege almost certainly would have to be held, as the prosecution argued, outside the presence of the jury.  *See, e.g., United States v. Melchor-Moreno*, 536 F.2d 1042, 1046 (5th Cir. 1976) (observing the accepted practice, post-*Hoffman*, whereby, "outside the presence of the jury," the judge examines the witness to "determine whether there is reasonable ground to apprehend danger to the witness from his being compelled to answer").

privilege was harmless. Petitioner concedes that the ASC's "summary decision potentially may have rested on a determination that any constitutional error was harmless[,]" but he maintains that he is entitled to relief because the trial court's error satisfies the harmless error standard of *Brecht*. Pet. ¶ 85.

There are two standards of harmless error that are relevant in federal habeas proceedings. The *Brecht* standard, discussed previously and referenced by petitioner, is independent of any state court adjudication of claims and must be satisfied before relief may be granted in habeas corpus. There is also the harmless error standard that is applicable on direct review of a conviction, which, when applied by a state appellate court, a federal court reviews through the prism of AEDPA.

> In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court held that on direct review, a federal constitutional error is harmless only if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt," *id*. at 24. Under AEDPA's unreasonable application prong, 28 U.S.C. § 2254(d)(1), federal habeas relief may only be granted if the state court's application of the *Chapman* harmless error standard on direct review was "objectively unreasonable." For ease of exposition, we refer to this standard as the "AEDPA/*Chapman*" standard.

*Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012) (citations omitted). Although petitioner cites authority in the petition postulating that the "AEDPA/*Chapman*" standard is "subsumed" by the *Brecht* standard, *see* Pet. ¶ 85,

intervening authority makes clear that the two standards are functionally distinct and that, in order to obtain relief, petitioner must satisfy both. *See Brown v. Davenport*, 596 U.S. __, 142 S. Ct. 1510, 1524 (2022). While petitioner argues that his claim satisfies even the ostensibly more demanding harmless error standard of *Brecht*, he has not shown, pursuant to AEDPA, that any determination by the ASC that any error was harmless under *Chapman* was unreasonable.

To the extent petitioner's claim challenges the ASC's implicit harmless error determination as an unreasonable application of *Chapman*, he faces a high burden:

> *Chapman* merely announced the default burden of proof for evaluating constitutional errors on direct appeal: The prosecution must prove harmlessness beyond a reasonable doubt. And this Court has repeatedly explained that, when it comes to the AEDPA, "the more general the [federal] rule[,] . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations" before their decisions can be fairly labeled unreasonable.

*Brown*, 142 S. Ct. at 1530 (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010)). Thus, to succeed under the AEDPA/*Chapman* standard, petitioner must demonstrate to this court that, despite the substantial "leeway" afforded the ASC in applying *Chapman*, no fairminded jurist could agree with the ASC's decision that any error was harmless. *Id*.

To meet his burden, petitioner argues as follows:

> Ms. Harris's refusal to testify was far from harmless: her testimony would have provided the jury with corroborating evidence that Mr.

82

> Sockwell had not been paid $50—a facially suspect amount for murder-for-hire—to kill Isaiah Harris, and thus had not committed murder for pecuniary gain.  This testimony could well have created a reasonable doubt that Mr. Sockwell was guilty of any murder, let alone of capital murder.

Pet. ¶ 89.  In his brief, he argues that the prosecution's evidence that petitioner committed a murder for pecuniary gain "rested on a credibility contest in which the prosecution did not have a clear upper hand."  Doc. 26 at 21.  He asserts the jury reasonably could have found Harris's testimony more compelling than Freddie Patterson's testimony that petitioner expected to get more money after the shooting.  *Id*.  Thus, he maintains, "Harris's testimony would have at least called into doubt the prosecutor's allegation that Sockwell committed murder for $50—a facially suspect amount."  *Id*. at 22.

The ASC reasonably could have concluded that the trial court's failure to somehow pry free Harris's testimony over her Fifth Amendment invocation was harmless.  Several points would have reasonably supported this judgment, including the following: Freddie Patterson's testimony that petitioner stated "'he had to shoot him' and that 'he was gonna . . . get his money'" (*Sockwell*, 675 So. 2d at 13); petitioner's own admission in his police statement that he received a share of a hundred dollars, passed from Harris through McCarter before the shooting, for the killing of her husband before the shooting, with the prospect of more to be paid after

83

the shooting (*see* Doc. 14-7 at 84–86; *id*. at 100 ("She was talking about killing me 'cause she had gave us a hundred dollars to shoot him first")); and the lack of any reason to believe that the jury at petitioner's trial would have found Harris's self-serving testimony more credible than did the jury that first heard the testimony and convicted Harris of capital murder.

To be sure, as petitioner argues, Harris's testimony would have constituted an evidentiary point on the opposite side of the scale.  But he presents no reason why Patterson's testimony about what he heard from petitioner was not credible.  He asserts only that Patterson "had no first-hand knowledge of the facts surrounding the payment allegedly given" to petitioner and Patterson had his own "serious credibility problems" "because he was in the car with [petitioner and his codefendants] on the night of the shooting."  Doc. 26 at 21.  But the jury apparently found Patterson credible notwithstanding his presence in the car with McCarter, Hood, and petitioner, and Harris's testimony that she had paid petitioner for a car repair rather than a murder would not have undermined Patterson's testimony about what he heard petitioner say because, as petitioner acknowledges, Patterson did not profess "first-hand knowledge" about from whom petitioner expected to "get his money." *See* R. at 511 (Patterson denying that petitioner "refer[red] to anybody while he was talking about" getting his money).

At bottom, in the "credibility contest" petitioner describes, he was badly outmatched. Arrayed against Harris's self-serving, and already once repudiated, testimony was Patterson's testimony and petitioner's own statement against his interests in which he admitted to the essential elements of the capital murder charge. Hence, the ASC was not unreasonable in concluding that the failure to force Harris to testify over her Fifth Amendment invocation was harmless. Put another way, considering the substantial "leeway" due the ASC when applying *Chapman*, "[e]ven if some fairminded jurist applying *Chapman* could reach a different conclusion, [this court] cannot say that every fairminded jurist must." *Brown*, 142 S. Ct. at 1530. Accordingly, petitioner cannot satisfy the AEDPA/*Chapman* standard governing the ASC's implicit conclusion that any error described in Claim Two was harmless.

### iv. *Any error was harmless under* Brecht.

Finally, even if petitioner could satisfy the AEDPA/*Chapman* standard, he cannot show that such error caused him actual prejudice under *Brecht*. As stated previously, actual prejudice under *Brecht* results when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. In general, the *Brecht* standard "is more favorable to and less onerous on the state, and thus less favorable to the defendant than the *Chapman* harmless beyond a reasonable doubt standard." *Mansfield*, 679 F.3d at 1307 (quotation marks omitted).

"To show prejudice under *Brecht*, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010). "To determine the effect on the verdict of a constitutional error, the Court must consider the error 'in relation to all else that happened' at trial." *Trepal v. Sec'y, Florida Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). "The question turns on whether the Court can 'say, with fair assurance,' that the verdict 'was not substantially swayed by the error[.]'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437–38 (1995)).

In arguing that Harris's testimony would have provided alternative evidence probative of the pecuniary gain aspect of petitioner's capital murder charge—*i.e.*, that Harris's testimony "would have at least called into doubt" the prosecution's theory—petitioner has, at most, raised only a "reasonable possibility" that the absence of Harris's testimony swayed the jury's verdict. Even if credited, that showing is insufficient to demonstrate actual prejudice under *Brecht*. For the reasons discussed previously, this court cannot conclude that any error by the trial court in permitting Louise Harris to refuse to testify substantially swayed the jury's verdict at petitioner's trial. It is not likely that the jury would have credited Harris's self-serving testimony, already repudiated by one jury, over the damning testimony

of Patterson and petitioner's own admission that he received money from Harris for the murder of her husband. Accordingly, petitioner cannot show actual prejudice under *Brecht*.

### 3.    Claim Three

Claim Three is petitioner's claim that the prosecutor's repeated references in her rebuttal closing argument to out-of-court inculpatory statements made by McCarter and Hood, who did not testify at petitioner's trial,[14] violated the Confrontation Clause of the Sixth Amendment. This claim was presented on direct appeal to the ACCA, which denied the claim in a reasoned decision in which it found any Confrontation Clause violation harmless. *See Sockwell*, 675 So. 2d at 34–35. Petitioner then presented the claim to the ASC, which, as previously discussed, summarily denied the claim. *Ex parte Sockwell*, 675 So. 2d at 42. Accordingly, this court reviews the state court's decision pursuant to AEDPA.

### a.    *Clearly Established Federal Law*

The Sixth Amendment confers on the defendant in a criminal prosecution the right "to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI.

---

[14] Hood was called by the defense at petitioner's trial, but, like Louise Harris, invoked his Fifth Amendment privilege and refused to answer any questions beyond providing his name. R. at 813–14.

Petitioner identifies three Supreme Court decisions as comprising the clearly established federal law governing his claim. *See* Pet. ¶¶ 98–100.

*First*, in *Douglas v. State of Alabama*, 380 U.S. 415 (1965), a criminal defendant, Douglas, challenged on Sixth Amendment grounds a "procedure" by which the prosecution read the substance of a co-defendant's out-of-court inculpatory statement to the jury in response to the co-defendant's invocation of his Fifth Amendment privilege against self-incrimination. When the prosecution first called the co-defendant, Loyd, to the stand, Loyd's attorney objected and asserted Loyd's Fifth Amendment privilege. *Id*. at 416. The trial court overruled the objection and questioning proceeded. Loyd "refused to answer any questions concerning the alleged crime." *Id*. The trial judge ruled that Loyd could not assert the privilege because of his prior conviction "and ordered him to answer," but Loyd "persisted in his refusal." *Id*.

The trial judge then permitted the prosecutor to cross-examine Loyd as a "hostile witness." *Id*. The prosecutor proceeded to read from Loyd's out-of-court statement, stopping repeatedly to ask whether Loyd made each statement that the prosecutor read aloud. *Id*. Loyd continued to assert his privilege throughout this exchange. *Id*. Among the statements from the document read by the prosecutor was

88

Loyd's charge that Douglas was the triggerman in the "assault with intent to murder" for which he was on trial. *Id.*

> The Supreme Court held that this "procedure" violated the Sixth Amendment:

> [Douglas's] inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. Loyd's alleged statement that [Douglas] fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of [Douglas's] act and of the requisite intent to murder. Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.

380 U.S. at 419. Because "effective confrontation of Loyd was possible only if Loyd affirmed the statement as his[,]" and Loyd refused to do so, Douglas was deprived of any opportunity to challenge "a fundamental part of the State's case against" him. *Id.* at 420.

*Second*, in *Ohio v. Roberts*, 448 U.S. 56, 62 (1980), the Supreme Court was "called upon to consider the relationship between the Confrontation Clause and the hearsay rule with its many exceptions." Specifically, the question was whether the State may introduce at a criminal trial the transcript of a witness's testimony at a preliminary hearing because the witness was not available to testify at trial. The

89

Supreme Court outlined the following test for the admission of hearsay statements where the Confrontation Clause is implicated:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id*. at 66.[15]

*Third*, in *Lee v. Illinois*, 476 U.S. 530 (1986), the defendant-petitioner, Lee, was jointly tried with a co-defendant, Thomas, in a bench trial on charges of double murder. Both Lee and Thomas gave statements to police. The statements had several "parallels," but differed especially on how Thomas and Lee "came to commit the murders." *Id*. at 535. Specifically, Thomas's statement described Lee's participation in a "premeditated plan to kill." *Id*. Lee, by contrast, stated that Thomas had been provoked to murder and "snapped," and she confessed no premeditation or prior planning of the murders. At the bench trial, "[n]either defendant testified" and "both the prosecution and the defendants relied heavily on

---

[15] *Ohio v. Roberts* was abrogated by *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* was decided after direct review of petitioner's conviction was complete, and it is not retroactive to cases on collateral review. *See Whorton v. Bockting*, 549 U.S. 406, 409 (2007). Hence, the test articulated in *Roberts* remains "clearly established federal law" for AEDPA purposes at the time of the state court decisions in this matter.

the confessions." *Id*. at 536.   In finding Lee guilty, the trial judge rejected exculpatory statements in Lee's confession and, instead, "expressly relied on Thomas' confession and his version of the killings" to discount Lee's version. *Id*. at 538.

The Supreme Court observed in *Lee* that it confronted a scenario "strikingly similar to *Douglas*[,]" because, "as in *Douglas*, the State sought to use hearsay evidence as substantive evidence against the accused.   In both cases, the hearsay in question was a confession made by an alleged accomplice, and in neither case was the defendant able to confront and cross-examine the declarant." *Id*. at 542.   The only material contrast with *Douglas* observed by the Court favored Lee because Thomas's inculpatory statement was "admitted into evidence by the judge" whereas the "procedure" condemned in *Douglas* did not result in the "technical" admission of evidence. *Id*. at 542–43.   Accordingly, the Court found that Lee's Confrontation Clause right was violated.   The Court further held that Thomas's statement was not admissible under *Robert*s because it lacked adequate indicia of reliability. *Id*. at 544–45.

### b.    *Proceedings in the Trial Court*

Although petitioner alleges that the prosecution's "repeated references" to the inculpatory statements of McCarter and Hood in her rebuttal closing argument

violated the Sixth Amendment, it is important to observe that the prosecutor's rebuttal closing argument was not the first time the jury heard about McCarter's and Hood's statements.  Indeed, McCarter's and Hood's identifications of petitioner as the shooter were referenced several times during trial and were also the subject of speculation in the defense's own closing argument.

To begin with, petitioner's own out-of-court statement, which was admitted into evidence in video, audio, and written transcript formats, references McCarter's and Hood's inculpatory statements identifying petitioner as the shooter.  *See* Doc. 14-7 at 94.  Specifically, Bruce Huggins, the Montgomery County Sheriff's Department investigator who obtained petitioner's statement, advised petitioner during his interview that both McCarter and Hood had identified him as the shooter. When Huggins testified at petitioner's trial, on cross-examination, defense counsel elicited Huggins's testimony that, as reflected in petitioner's statement, both McCarter and Hood told Huggins that petitioner was the shooter.  R. at 668.  The defense elicited this fact again still later in its cross-examination of Huggins when it confirmed Huggins's belief that McCarter and Hood had been truthful about petitioner's role as the shooter.  R. at 673–74.

More references to McCarter's and Hood's inculpatory statements followed when petitioner testified in his own defense.  During petitioner's direct examination,

he testified that he confessed to shooting Isaiah Harris because he was scared and because Huggins told petitioner McCarter and Hood had already identified him as the shooter and he "was gonna get blamed for it anyway." R. at 830. Petitioner also referenced Huggins's assertion that McCarter and Hood had identified him as the shooter on cross-examination. R. at 893, 906. Finally, to complete her cross-examination, the prosecutor asked petitioner if he could explain why Hood, Patterson, McCarter, and Gilmore all implicated him as the shooter. R. at 912.

In the prosecution's initial closing argument, while summarizing the course of the investigation, the prosecutor referenced both McCarter's and Hood's identifications of petitioner as the shooter. R. at 958. Then, still later, the prosecutor argued that, "[w]ell, everybody in the car said he did it, his roommate said he did it, Bobo McCarter said he did it, Kenneth Gilmore, one of his best friends that he grew up with said he did it, and he said he did it the day after he did. All four people in that car said he did it and he said yes, I did it." R. at 968. The prosecutor then repeated that "[e]verybody in the car says he did it" once more before resting. R. at 969.

In the defense's closing argument, counsel immediately reminded the jury that neither McCarter nor Hood had accused petitioner of being the shooter "from the witness stand." R. at 970. The defense later emphasized that the jurors had heard

direct evidence about the shooter from only two people who were there that night: Patterson and petitioner.  R. at 973.  The defense later again referenced the part of petitioner's statement in which Huggins informed petitioner that McCarter and Hood had identified him as the shooter.  R. at 992.  Still later in closing, the defense asked the jury to ponder "why would Bobo McCarter, Al Hood, confess to the police that they were involved in it or tell 'em that Michael Sockwell did it if he didn't?"  R. at 995.  The defense posited that both were motivated to admit their involvement while pointing to petitioner as the shooter in order to obtain favorable treatment because, they must have believed, "as long as you didn't' pull the trigger you're not guilty so I'm gonna say Sockwell pulled the trigger."  R. at 995–96.

All of this set the stage for the prosecution's rebuttal closing argument.  When the prosecutor mentioned McCarter's statement and the defense's argument about his treatment by prosecutors, the following exchange occurred:

> Then they want to tell you well, State's cut a deal.  They've got Lorenzo McCarter.  My goodness.  I think he used the term wool was pulled over our eyes.  Ladies and gentlemen, the testimony is uncontradicted that on the night -- the day he was arrested, Lorenzo McCarter gave a statement to law enforcement officials.  It is uncontradicted that Lorenzo McCarter then said the shooter was Michael Sockwell.  March 11th, 1988 his statement.
>
> MR. WISE:  Your honor, I object.  There's been no testimony from Mr. Lorenzo McCarter.
>
> MS. BROOKS:  No need for any testimony.

THE COURT:  Sustained.

MS. BROOKS:  Is there? It's uncontradicted what he said.

MR. WISE: Your Honor, I ask the Court to instruct the jury to disregard it.

THE COURT:  Sustained.

MS. BROOKS:  And Mr. Wise is upset –

THE COURT:  Sustained.

MS. BROOKS:  Excuse me, Judge.

THE COURT:  Jury will disregard anything about the times you said it.

MS. BROOKS (continuing:)
Y'all will remember that it was uncontradicted that Bruce Huggins and Mark Thompson, from this witness stand under oath, told you at the request of the Defense attorneys that they had, at the time they took the statement of the defendant on this video statement, statements from McCarter and Hoods [sic] that this defendant was the shooter.  They had that. March 11, 1988.
    . . .
Now they want to talk about the Fifth Amendment.  Remember we had, very briefly, Alex Hood come in.  They called him.  Mr. Hood, as he has a right to do, took the Fifth Amendment.  The State of Alabama cannot make him testify.  You probably would have liked to have heard his story.  We could not force him to testify.  We do know that it's undisputed that he said Michael Sockwell did it.  Now, Louise Harris, remember she came in and said she was from Tutwiler, gave her name and then said Fifth Amendment.  Can't make her testify either.  And somehow that's the State's fault?  How does that prove the defendant didn't do it? I submit to you, and they have a right to, and they took the Fifth Amendment because what they said would tend to

> incriminate them because they were involved with the defendant, Michael Sockwell. Louise Harris didn't pull the trigger, Lorenzo McCarter didn't pull the trigger, Alex Hood didn't pull the trigger. They were involved. Who supplied the car? Hood. Who paid 'em the money? McCarter. Who provided the money and planned it and stood to benefit the most financially? Louise Harris. They're just as guilty, and their guilt does not mean Michael Sockwell is not guilty.

R. at 1010–14. Still later in the rebuttal closing, the prosecutor again mentioned Hood's identification of petitioner as the shooter. R. at 1018–19. Finally, in concluding her rebuttal closing, the prosecutor once again obliquely referenced the statements of McCarter and Hood when she argued that the reason petitioner lied at various points in his police statement and in statements attributed to him by other witnesses was because "[he] has a reason to. He is the only one who claims anyone other than himself did it, did the shooting. He's the only one." R. at 1026.

### c.   *State Court Appellate Review*

In petitioner's supplemental brief on appeal to the ACCA, he argued that the prosecutor "repeatedly argued and elicited from witnesses inadmissible, inculpatory out-of-court statements by [petitioner's] non-testifying codefendants." Doc. 14-9 at 165. Petitioner cited *Lee* and *Douglas* for the proposition that "the uncross-examined statements of codefendants are incompetent, grossly unreliable evidence[,]" and argued that the references to their inculpatory statements violated the Sixth Amendment. *Id*. at 168–169.

In its opinion, the ACCA acknowledged *Douglas*'s Sixth Amendment holding but further noted that Confrontation Clause violations "are subject to harmless error analysis." *Sockwell*, 675 So. 2d at 34 (citing *Delaware v. Van Arsdall*, 475 U.S. 673 (1986)). The ACCA also noted the defense's objection to the prosecutor's references to the statements of McCarter and Hood, and the trial court's instruction that the jury "disregard the prosecutor's references." *Id*. The ACCA then concluded that any error was harmless:

> In this case, ample evidence was presented to show that the appellant was the shooter. Patterson testified that the appellant was the shooter. The appellant was known to be carrying a shotgun in Hood's vehicle. Gilmore testified that the appellant told him that he shot someone in the face. Additionally, the appellant, in his statement to Investigator Huggins, stated that he shot the victim. Thus, in light of the overwhelming evidence and in light of the instruction that the trial judge gave to the jury when defense counsel objected, the prosecutor's argument to the jury during closing argument that Hood and McCarter stated to the police that the appellant was the shooter was harmless error.

*Id*. at 35.

In his brief in support of his petition for certiorari to the ASC, petitioner repeated his Confrontation Clause claim, with some additional references to portions of the record not highlighted in his briefing before the ACCA. *See* Doc. 14-12 at 91–97. As discussed previously, the ASC summarily denied the claim. *Ex parte Sockwell*, 675 So. 2d at 42.

#### d. *Petitioner's arguments pursuant to § 2254(d)*

Petitioner argues that "this Court must presume that the [ASC]'s decision rested on the [ACCA]'s harmless error analysis, and that the [ASC] accepted the apparent conclusion of (or at least the assumption without decision) of the [ACCA] that the prosecutor's conduct violated the Sixth and Fourteenth Amendments." Pet. ¶ 96. He asserts that any determination by a state court that his Confrontation Clause rights were not violated "would be an unreasonable application of clearly established federal law." *Id*. at ¶ 102. He further alleges that the constitutional error was not harmless, as found by the state courts. *Id*. at ¶¶ 103–111.

#### e. *Application*

Claim Three is due to be denied for at least two reasons: 1) the ACCA's decision finding any Confrontation Clause error harmless is not contrary to, or an unreasonable application of, clearly established federal law, and is not based upon an unreasonable finding of fact;[16] and 2) any error was harmless under *Brecht*.

---

[16] Because the ASC issued a summary decision affirming the ACCA's reasoned disposition of Claim Three, this court presumes that the ASC relied upon the ACCA's reasoning and "looks through" its summary decision to apply AEDPA's standard of review to the ACCA's reasoned decision. *See Wilson v. Sellers*, 584 U.S. __, __, 138 S. Ct. 1188, 1192 (2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

> i.    *Petitioner cannot satisfy the AEDPA/*Chapman *standard.*

Petitioner can obtain relief only if he can show that the ACCA's decision finding any error harmless was "objectively unreasonable." *Mansfield*, 679 F.3d at 1307.  As discussed previously, he faces a high burden in this endeavor because the applicable clearly established federal law, *Chapman*, supplies a "general" rule that affords state courts considerable "leeway" in its application.  *Brown*, 142 S. Ct. at 1530.  That standard is simply that a constitutional error is harmless if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24.  *See also United States v. Nicholson*, 24 F.4th 1341, 1354 (11th Cir. 2022) (internal quotations and citations omitted) ("A constitutional error is harmless when the government proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.  To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.").  In essence, then, petitioner must show that no "fairminded jurist" could agree with the ACCA's determination that any error did not contribute to the jury's verdict.  For the following reasons, he cannot do so.

The strongest reason that fairminded jurists can agree with the ACCA's harmless error decision is that, as the ACCA found, the evidence establishing that

petitioner was the shooter was "ample."   That evidence included Patterson's testimony directly identifying petitioner as Harris's shooter, Gilmore's testimony that petitioner admitted having shot someone in the face, and petitioner's own statement admitting to the crime.  While petitioner contests each of these evidentiary points, his arguments suggest, at most, why a fairminded jurist might disagree with the ACCA's conclusion.  He falls far short of demonstrating that a fairminded jurist *could not* agree with the ACCA's conclusion.  This is insufficient to meet his burden. *See Brown*, 142 S. Ct. at 1530 ("Even if some fairminded jurist applying *Chapman* could reach a different conclusion, [this court] cannot say that every fairminded jurist must.").

For example, petitioner again alleges that Patterson had his own credibility issues because he was in the car with McCarter, Hood, and petitioner and, therefore, was substantially motivated to "exculpate himself from criminal liability."   Pet. ¶ 107.   Fair enough, but Patterson testified and was subject to cross-examination. Petitioner points to nothing in the record showing that his testimony was incredible or that the ACCA unreasonably relied upon his testimony in its harmless error analysis.

Petitioner next impugns Gilmore's testimony about petitioner's admission that he shot someone because that person "slapped him," arguing that such

100

"testimony was *inconsistent* with the prosecution's theory that Mr. Sockwell shot the victim 'without notice'" and that there was "no other evidence of any altercation between the victim and Mr. Sockwell or that the victim 'slapped' Mr. Sockwell." *Id.* (emphasis petitioner's).  But that establishes, at most, only that petitioner may have lied to Gilmore about the reason that he shot Harris; it does not materially impeach Gilmore's testimony that petitioner admitted to shooting someone, much less show that the ACCA was unreasonable in relying on it in its harmless error analysis.

Finally, petitioner alleges that his own confession was unreliable because it was coerced and "contained factual inaccuracies." *Id.*  These points were argued at trial and the jury plainly rejected them.  The ACCA was not unreasonable in concluding that the jury's rejection of these points was not attributable to the prosecution's references to McCarter's and Hood's statements incriminating petitioner.

The record reveals other reasons why the ACCA reasonably concluded that the prosecution's references to McCarter's and Hood's inculpatory statements were harmless beyond a reasonable doubt.  *First*, just as petitioner has argued with respect to Patterson, to the extent the jury might have put any stock in the hearsay references to their statements, the jury surely would have understood that McCarter and Hood

101

also were highly motivated to shift blame onto petitioner and away from themselves. As reviewed above, the defense argued this point in its own closing argument.

*Second*, the defense was able to argue that McCarter's and Hood's statements were unreliable because—unlike petitioner's statement to investigators—they did not indicate that a fourth person, Patterson, was in the car around the time of the murder. In other words, the defense was able to show that McCarter and Hood had lied, at least by omission, in their statements to Huggins. The defense elicited this fact in cross-examination of Huggins, R. at 668, and argued it in its own closing argument. *See* R. at 981–82.

*Third*, the defense repeatedly made the point that neither McCarter nor Hood had testified from the stand about petitioner. The defense's objection to the prosecution's references to the out-of-court statements during rebuttal closing was sustained, and the jury was instructed to disregard the prosecutor's remarks. No doubt, the trial court's curative instruction could have been more comprehensive, but it cannot be said that the jury was left with the unfettered impression that it should treat any referenced statements by McCarter and Hood as evidence against petitioner. Considering all of these circumstances, the ACCA reasonably concluded that the prejudicial effect of the prosecution's references to the out-of-court

102

statements was sufficiently blunted such that any Confrontation Clause error did not contribute to the jury's verdict.

> ii.   *Any error was harmless under* Brecht*.*

Even if petitioner could satisfy the AEDPA/*Chapman* standard, he cannot show that any Confrontation Clause violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.  To reiterate, the *Brecht* standard "is more favorable to and less onerous on the state, and thus less favorable to the defendant than the *Chapman* harmless beyond a reasonable doubt standard." *Mansfield*, 679 F.3d at 1307 (quotation marks omitted).  Petitioner must show "more than a reasonable possibility that the error contributed to the conviction or sentence." *Mason*, 605 F.3d at 1123.

For the reasons already given—namely, the "ample" evidence of petitioner's guilt, the defense's capable argument that any statements by McCarter and Hood were unreliable, the defense's emphasis that the jury had received no evidence from McCarter and Hood, and the trial court's prompt, albeit imperfect, curative instruction when the defense objected—this court cannot conclude that there is more than a reasonable possibility that the prosecutor's references to McCarter's and Hood's statements during rebuttal closing contributed to the jury's guilty verdict. Accordingly, this claim is due to be denied.

### 4.     Claim Four

Claim Four is petitioner's claim that the trial court violated his rights under the Eighth and Fourteenth Amendments by overriding the jury's recommendation of life imprisonment and sentencing him to death on the basis of extra-record information.   Pet. ¶¶ 112–13.   Specifically, he alleges the trial court's written sentencing order, issued nearly a year after his death sentence was announced at the sentencing hearing, contained "numerous inflammatory references to evidence from the trial of Louise Harris that had never been presented at Mr. Sockwell's trial, and that Mr. Sockwell had no opportunity to challenge or rebut."  *Id*. at ¶ 113.

#### a.     *Clearly Established Federal Law*

Petitioner identifies one United States Supreme Court decision, *Gardner v. Florida*, 430 U.S. 349 (1977), as comprising the clearly established federal law governing his claim for AEDPA purposes.   Pet. ¶¶ 116–21.   In *Gardner*, the defendant, Gardner, was convicted of first-degree murder for beating his wife to death with a "blunt instrument."  *Id*. at 351.  While the jury deliberated his sentence, the trial judge ordered the completion of a presentence investigation report ("PSI").  *Id*. at 352.  The jury then returned its advisory verdict, finding that the mitigating circumstances outweighed the aggravating and that, accordingly, Gardner should be sentenced to life.  *Id*. at 352–53.  A little more than two weeks after trial, the PSI

was completed, and two days after completion the trial judge entered his "findings of fact and judgment sentencing petitioner to death." *Id*. at 353. The trial judge found one aggravating circumstance, that the murder was especially heinous, atrocious, and cruel, and found no mitigating circumstances. *Id*. The judge therefore concluded that the aggravating circumstances outweighed the mitigating and sentenced Gardner to death.

"As a preface to that ultimate finding, [the trial judge] recited that his conclusion was based on the evidence presented at both stages of the bifurcated proceeding, the arguments of counsel, and his review of 'the factual information contained in said pre-sentence investigation.'" *Id*. (citation omitted). The PSI "contained a confidential portion which was not disclosed to defense counsel." *Id*. "The trial judge did not comment on the contents of the confidential portion. His findings do not indicate that there was anything of special importance in the undisclosed portion, or that there was any reason other than customary practice for not disclosing the entire report to the parties." *Id*.

The plurality opinion in *Gardner* held that, to the extent it allowed "a trial judge to impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel[,]" *id*. at 358, this procedure violated due process of law. The opinion identified two principle rationales in support. *First*,

the plurality opinion remarked that, because "death is a different kind of punishment from any other which may be imposed[,]" "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Id*. at 357–58.   *Second*, the plurality opinion recognized that "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." *Id*. at 358.   This is so because the "defendant has a legitimate interest in the character of the procedure which leads to the imposition of the sentence even if he may have no right to object to a particular result of the sentencing process." *Id*. (citation omitted).

Justice White's concurring opinion explained why Florida's procedure violated the Eighth Amendment, and why that conclusion warranted relief without the need of any due process analysis:

> Here the sentencing judge indicated that he selected petitioner Gardner for the death penalty in part because of information contained in a presentence report which information was not disclosed to petitioner or to his counsel and to which petitioner had no opportunity to respond. A procedure for selecting people for the death penalty which permits consideration of such secret information relevant to the character and record of the individual offender, fails to meet the need for reliability in the determination that death is the appropriate punishment[.] . . . This conclusion stems solely from the Eighth Amendment's ban on cruel and unusual punishments[,] . . . and my conclusion is limited . . . to cases in which the death penalty is imposed.  I thus see no reason to address in this case the possible application to sentencing proceedings in death or other cases of the Due Process Clause, other than as the

> vehicle by which the strictures of the Eighth Amendment are triggered
> in this case.

430 U.S. at 363–64 (internal quotations and citations omitted).

The Supreme Court has subsequently "adopted Justice White's concurrence as the rule of *Gardner* and explained that the holding of *Gardner* is that "'[a] procedure for selecting people for the death penalty which permits consideration of . . . secret information relevant to the character and record of the individual offender' violates the Eighth Amendment's requirement of 'reliability in the determination that death is the appropriate punishment.'" *Muhammad v. Sec'y, Florida Dep't of Corr.*, 733 F.3d 1065, 1073–74 (11th Cir. 2013) (quoting *O'Dell v. Netherland*, 521 U.S. 151, 162 (1997)).

### b.    *Proceedings in the Trial Court*

After the jury returned its 7-5 recommendation that petitioner be sentenced to life, the trial court scheduled a separate sentencing hearing as required by Alabama law.  At that hearing, held a few weeks after trial concluded, prosecutors presented additional witness testimony about a previous incident involving petitioner's use of a firearm.  Following the witness testimony and summary argument by the parties, the trial court sentenced petitioner to death.  R. at 1262.  Several months later, the State filed a proposed sentencing order.   The trial court entered the proposed

sentencing order on February 28, 1991, almost one full year following the trial court's pronouncement of sentence on March 2, 1990.

The trial court prefaced the sentencing order by articulating the sources upon which it drew in making its findings:

> The findings contained in this order are based upon the evidence presented at trial, the evidence presented at the sentencing hearing before the jury, the presentence report with the exception of the victim impact statement which the Court has not read and will not consider, and the evidence presented at the sentencing hearing before this Court. The Court has considered all contentions made by the parties. The Court has also considered the jury's advisory verdict.

Doc. 14-8 at 38. In a section titled, "General Findings Concerning the Defendant and the Crime," the sentencing order included several findings relating to Louise Harris that were not in evidence or otherwise part of the record. The petition summarizes these "findings" as follows:

> Among other things, the order stated that Louise Harris had never obtained a divorce from the victim; that she asked Mr. McCarter to hire someone to kill her husband; that she engaged in an extramarital affair with Mr. McCarter; that she did not express concern for her husband when his employer called to inquire why he was not at work; that she also did not express grief when the police informed her that her husband had been murdered; and that she said Mr. McCarter "made love to her like nobody else could."

Pet. ¶ 113. *See also* Doc. 14-8 at 39–40.[17]

---

[17] Upon review and comparison, it is evident that the "General Findings Concerning the Defendant and the Crime" section of the trial court's sentencing order was a "cut-and-paste" of the same section in the sentencing order previously entered by the same trial court

The sentencing order then proceeded to discuss aggravating and mitigating circumstances.  Specifically, the trial court found one aggravating circumstance supported by the evidence:  that the murder was committed for pecuniary gain.  Doc. 14-8 at 41.  Balanced against this was the statutory mitigating circumstance that petitioner had no prior felony convictions, as well as evidence of non-statutory mitigating circumstances, including petitioner's familial connections, commendable work record, his good behavior after his arrest, and that he "appeared somewhat remorseful and cooperative."  *Id*. at 42.  Ultimately, the trial court determined "that the one statutory aggravating circumstance found and considered far outweighs all of the statutory and non-statutory mitigating circumstances, and that the sentence ought to be death."  *Id*. at 43.

### c.    *State Court Appellate Review*

On direct appeal to the ACCA, petitioner claimed that the trial court erred at sentencing in "considering arbitrary factors in imposing the death sentence" and, in support, identified the several "findings" regarding Louise Harris that were previously described.  Doc. 14-9 at 107–08.  He argued that the sentencing order

---

in the Louise Harris prosecution.  *See* Doc. 24, Exh. A, C.R. 1254, *Harris v. Thomas*, 2:11-cv-552-WKW-SRW.  There are minor edits to convey unique biographical information about each defendant, but, in all other respects, including the "inflammatory" information about Harris described in the instant petition, the description of the crime is the same in the Harris and Sockwell sentencing orders.  Petitioner highlighted this comparison in his brief before the ASC.  *See* Doc. 14-12 at 126–27.

shows that the trial judge "allowed extra-judicial matter to interfere with his duty as a judge." *Id*. at 109.[18]

The ACCA rejected the claim, ultimately finding any error harmless. The ACCA described the facts pertaining to Harris included in the sentencing order, but further observed "that several of the general facts as set forth in the trial court's sentencing order are reasonable inferences from the evidence produced at trial." *Sockwell*, 675 So. 2d at 30. While acknowledging that some of the facts set forth in the order "were not based upon evidence contained in the record," the ACCA held "that error in the trial court's sentencing order is not so egregious as to require a new sentencing order." *Id*. In support, the ACCA found that "there was ample evidence and facts adduced from that evidence in this case that the murder was committed for pecuniary gain, justifying the imposition of a death sentence." *Id*. The ACCA then articulated its harmless error analysis:

> While the trial court refers to some extraneous matters in the sentencing order, it is clear that the trial court considered the statutory and nonstatutory mitigating circumstances in imposing sentence upon the appellant. Additionally, the trial court found only one aggravating circumstance—that the murder was committed for pecuniary gain. The sentencing order reflects that the trial court weighed the mitigating

---

[18]As discussed previously, petitioner also raised a constitutional challenge to the trial court's sentencing order in his supplemental brief in the ACCA, in which he argued that, pursuant to *Gardner*, the trial court's consideration of evidence that was not presented at his trial violated his "right, as a capital defendant, to be confronted with and to respond to any evidence, argument, or other information presented to the sentencer." *See* Doc. 14-9 at 139–40.

circumstances and the aggravating circumstance and there is no evidence that the trial court failed to consider the mitigating circumstances. The sentencing order does not reflect that the court considered any extraneous matter in imposing sentence against the appellant. Therefore, because the extraneous matters did not affect the trial court's proper weighing of the aggravating and mitigating circumstances, we find that the court's referral to some extraneous matter in its sentencing order was harmless error.

*Id*.

On appeal to the ASC, petitioner again challenged the trial court's reliance on extra-record information about Harris in the sentencing order. Citing *Gardner*, he argued that he was deprived of his right "to be confronted with and to respond to any evidence, argument or other information presented to or relied on by the sentencer." Doc. 14-12 at 129. He also argued that, because he was sentenced to death, at least in part, on evidence that was applicable only to Harris, he was deprived of an individualized determination of sentence, as required by the Eighth Amendment. *Id*. at 130. He also argued, again citing *Gardner*, that the ACCA's harmless error analysis was "legally flawed and factually untenable." *Id*. at 131–33. The ASC summarily denied petitioner's claim on the merits. *See Ex parte Sockwell*, 675 So. 2d at 42.

### d.    *Petitioner's Argument Pursuant to § 2254(d)(1)*

Petitioner argues that the ACCA's harmless error analysis is subject to review under the AEDPA and that any implicit determination that his constitutional rights

111

were not violated "involved an unreasonable application of clearly established federal law."  Pet. ¶ 115.

### e.   Application

As discussed previously, there is some ambiguity about whether petitioner presented Claim Four in the ACCA.  While this ambiguity has no bearing on whether the claim is procedurally defaulted, it potentially determines which state court decision is subject to AEDPA's standard of review in this court.  If, as the parties appear to have agreed, the constitutional claim was first presented to the ASC, which summarily denied it, then there is no reasoned state court appellate decision addressing the constitutional claim.  In that circumstance, this court "must determine what arguments or theories supported, or . . . could have supported the state court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Harrington*, 562 U.S. at 102.  In that review, this court would consider whether the ASC reasonably could have determined that there was no constitutional violation under *Gardner*, or whether the ASC reasonably could have determined that any *Gardner* error was harmless beyond a reasonable doubt under *Chapman*.

112

If, on the other hand, the constitutional claim was presented to the ACCA, which denied it on harmless error grounds, and then was presented to the ASC, which summarily affirmed the ACCA, then this court is to presume that the ASC relied upon the ACCA's reasoning and "look through" its summary decision to apply AEDPA's standard of review to the ACCA's reasoned decision. *Wilson*, 138 S. Ct. at 1192.  Because the ACCA applied harmless error analysis and did not plainly determine whether a constitutional violation under *Gardner* occurred, there is no adjudication of that constitutional question to which this court would apply AEDPA's standard of review.  Instead, this court would review the ACCA's harmless error analysis pursuant to the AEDPA/*Chapman* standard.

Ultimately, this court need not hack its way out of this thicket because, no matter which state court decision is operative for AEDPA purposes, petitioner cannot show that any error under *Gardner* had a substantial and injurious effect or influence on the trial judge's determination of his sentence.[19]  Because he cannot show that any error was not harmless under *Brecht*, Claim Four may be denied irrespective of any AEDPA review of the decisions of the state courts.  *See, e.g., Mansfield*, 679 F.3d at 1308 ("Similarly, a federal court may deny habeas relief

_____

[19] *Gardner* error is subject to harmless error review under *Brecht*.  *See Vining v. Sec'y, Dep't of Corr.*, 610 F.3d 568, 570–71 (11th Cir. 2010); *id.* at 571 n.3 (recognizing that, although *Brecht* describes a "prejudicial impact on the jury," the same analysis applies "in cases where the judge may accept or reject a jury recommendation").

based solely on a determination that the constitutional error is harmless under the *Brecht* standard.").

Several circumstances demonstrate that the paramount concerns of *Gardner* were not necessarily implicated by the trial court's sentencing order.  Start with what has come to be recognized as the applicable rule of *Gardner*.  Justice White's concurring opinion was concerned with a "'procedure for selecting people for the death penalty which permits consideration of . . . *secret information relevant to the character and record of the individual offender*[.]'"  *O'Dell*, 521 U.S. at 162 (quoting *Gardner*, 430 U.S. at 364) (emphasis supplied).

Here, even if the facts about Louise Harris included in petitioner's sentencing order could be described as "secret," in that they were not revealed to petitioner in a manner that allowed him to rebut them before he was sentenced, it cannot be argued that they are "relevant to the character and record" of petitioner.  Were the extra-record facts included in the sentencing order even arguably "relevant" to petitioner, the ambiguity about what the sentencer considered that was determinative in *Gardner* would be conspicuous.  Here, however, the Harris facts that are not reasonable inferences from the record—namely, the status of her marriage, her callous indifference to her husband's death, her comments about McCarter's sexual prowess—plainly have nothing to do with *petitioner*.  It is therefore more plausible

114

here than in *Gardner* that a reviewing court can separate the wheat from the chaff and reliably discern whether the facts pertaining exclusively to petitioner's "character and record" are those that that the sentencing court actually relied upon in imposing the sentence.  This circumstance distinguishes petitioner's claim from both the due process and Eighth Amendment rationales underpinning the separate opinions in *Gardner*.

More important, the overall purpose, structure, and content of the sentencing order make clear that any *Gardner* error was harmless under *Brecht*.  As indicated by the ACCA, the sentencing order's ultimate function is "to allow an appellate court to review a death sentence."  *Sockwell*, 675 So. 2d at 30.  Under Alabama law, it is the presence, or absence, of aggravating and mitigating circumstances, and their relative weighing, that determines whether a defendant may be sentenced to death. It is apparent here that the sentencing order's inclusion of extraneous facts about Louise Harris did not intrude upon the trial court's findings respecting the presence of the pecuniary gain aggravating circumstance.  The sentencing order's findings respecting the aggravating circumstance are separately situated from the "general findings" about Louise Harris and in no way rely upon or relate to any of the extraneous facts about Harris.  *See* Doc. 14-8 at 40.  Likewise, the sentencing order's weighing of aggravating and mitigating circumstances does not suggest any

improper consideration of facts about Harris. The sentencing order is explicit that "the Court is convinced that the one statutory aggravating circumstance found and considered far outweighs all of the statutory and non-statutory mitigating circumstances, and that the sentence ought to be death." *Id.* at 42–43.

Petitioner's answer to this circumstance is that the same argument could be made about *Gardner*, "where the trial judge did not comment on the contents of the confidential portion" of the PSI or "indicate that there was anything of special importance in the undisclosed portion." Doc. 26 at 27 (quotations and citation omitted). This argument has at least two flaws, however. *First*, *Gardner* was not before the Supreme Court on habeas review and the error identified in *Gardner* was not subject to *Brecht*'s harmless error standard. *Second*, in *Gardner* the sentencer did say that he relied upon the PSI, with no qualification that he relied upon only the non-confidential portion of the document. Thus, there simply was no way to know whether anything in the confidential portion was germane to the sentence. Here, by contrast, the essential findings supporting the sentence—the presence of aggravating and mitigating circumstances, and their relative weight—are in no way predicated on any "secret," or previously undisclosed, facts about Louise Harris.

Petitioner concludes by arguing that "there is simply no conceivable reason (and respondent provides none) why the trial judge would include extra-record

116

information in his sentencing order if he did not even *consider* it in determining the sentence."   Doc. 26 at 28 (emphasis petitioner's).   On the contrary, there is a conceivable—even practical—reason, and, while it does not commend the trial court's diligence, it most likely explains what happened.   The reason Sockwell's sentencing order includes the extra-record information about Louise Harris is that it was constructed from the template of the Louise Harris sentencing order, with only minor edits to reflect Sockwell's unique biographical information.   The scrivener's attention to Sockwell's respective biographical information unfortunately did not extend to a scrupulous description of the "General Findings" about "The Crime" limited to the evidence admitted at Sockwell's trial.

No doubt, this level of inattention in capital sentencing should not be condoned.   But apparent inattention does not mean that petitioner was sentenced to death because of, or for the same reasons as, Louise Harris, or that any error in including extra-record information about Harris influenced the trial court's sentence. Petitioner was accused of shooting Isaiah Harris in the face with a shotgun in exchange for $50 and the hope of further payment after the deed.   The jury convicted him of capital murder for pecuniary gain.   The jury's verdict established the only aggravating circumstance the trial court relied upon in its sentencing determination. The trial court simply disagreed with the advisory jury's weighing of aggravating

117

and mitigating circumstances.  Considering these facts against what reasonably appears to be the trial court's failure to properly scrutinize a proposed sentencing order, this court can say, "with fair assurance," that the trial court's sentencing determination was not "substantially swayed" by consideration of any extraneous, albeit "inflammatory," facts about *Louise Harris*.  *O'Neal*, 513 U.S. at 437–38.  Accordingly, petitioner cannot show actual prejudice pursuant to *Brecht*.

### 5.    Claim Five

Claim Five is petitioner's claim that he cannot constitutionally be sentenced to death because he is intellectually disabled.  He first presented this claim to the state court in collateral review pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  *See* Doc. 14-18 at 15–16.  The operative amended Rule 32 petition presenting this claim was summarily denied by the Circuit Court of Montgomery County.  *See* Doc. 14-25 at 159–160.  The ACCA affirmed in a reasoned decision.  Doc. 14-25 at 180–183.  The ASC denied certiorari.  *Ex parte Sockwell*, 140 So. 3d 945 (Ala. 2013).  The parties are in agreement that the ACCA's decision rejected petitioner's claim on the merits, and that, accordingly, AEDPA's standard of review governs Claim Five.  *See* Pet. ¶¶ 130–31; Ans. (Doc. 13) ¶ 66.

### a.    Clearly Established Federal Law

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002),  the Supreme Court held that the Eighth Amendment forbids the execution of intellectually disabled persons. *Atkins* defined intellectual disability by reference to the American Association of Mental Retardation's definition:

> Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.

*Id*. at 308 n.3 (emphasis removed).

The Court in *Atkins* "granted the states some discretion to develop standards for assessing whether an offender is intellectually disabled." *Smith v. Comm'r, Alabama Dep't of Corr.*, 67 F.4th 1335, 1344 (11th Cir. 2023) (citation omitted). Shortly after *Atkins*, the ASC adopted "the broadest definition of mental retardation" for resolving *Atkins* claims in Alabama:

> [A] defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).

*Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002).  In addition, the defendant must

show that these "problems" were present at the time the crime was committed.  *Smith*

*v. State*, 213 So. 3d 239, 252 (Ala. 2007).

### b.   Proceedings in the Rule 32 Court

The operative amended Rule 32 petition presented petitioner's *Atkins* claim in

seven numbered paragraphs.  *See* Doc. 14-18 at 15–16.  Only two of these paragraphs

arguably alleged any discrete facts, as opposed to conclusions, in support of

petitioner's *Atkins* claim.  The third paragraph alleged as follows: "Alabama Lunacy

Commission reports prepared after Petitioner's arrest, from November 1988, showed

him as having a 'borderline intelligence.'  Petitioner's Montgomery Public School

records from September 1974 indicate Petitioner's IQ at 64."  The fifth paragraph

alleged that petitioner's intellectual disability "prevented him, in this case, from

providing any meaningful assistance to counsel during the trial."  The remainder of

the paragraphs generally described the holding and rationale of *Atkins* and allege that

petitioner is entitled to *Atkins* relief.

The Circuit Court granted the State's motion to dismiss the Rule 32 petition

without affording an evidentiary hearing.  On the *Atkins* claim, the Circuit Court

concluded that petitioner "is not mentally retarded."  Doc. 14-25 at 159.  The Circuit

Court recited Alabama's definition of intellectual disability and ruled as follows:

"Sockwell has failed to allege or provide any evidence of 'significant or substantial deficits in adaptive behavior.' In as much as Sockwell's second amended petition has failed to support his claim, this petition is insufficiently pleaded and, therefore, DISMISSED." *Id*. at 160 (citations omitted).

### c.    *State Court Appellate Review*

The ACCA affirmed the Rule 32 court's summary dismissal of petitioner's *Atkins* claim:

> Sockwell argues that the trial court should not have held that he failed to adequately plead the second and third prongs set forth in Ex parte Perkins because, he says, "[T]he common thread that is pleaded in Petitioner's Rule 32 [petition] is one of adaptive deficits and mental impairment beginning around age 12." A postconviction petition "must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Rule 32.6(b), Ala. R. Crim. P. To satisfy Rule 32.6(b), Sockwell was required to plead full facts to support each individual claim. Thus, contrary to what Sockwell now argues, it is not sufficient that the facts necessary to support this claim might somehow be gleaned from other parts of the petition that raise other claims and pieced together to form a fully-pleaded claim. Sockwell pleaded a conclusion that he is mentally retarded. In this claim the only facts Sockwell alleged in support of the claim are: "Alabama Lunacy Commission reports prepared after Petitioner's arrest, from November 1988, showed him as having a 'borderline intelligence'. Petitioner's Montgomery Public School records from September 1974 indicate Petitioner's IQ at 64."
>
> Sockwell clearly failed to plead facts on which an Atkins claim can be based. An allegation of borderline intellectual functioning actually contradicts an Atkins claim. The remaining allegation – a subaverage IQ score in public school -- is not sufficient to plead any of the three prongs of Ex parte Perkins. Therefore, the trial court correctly

> found this claim to be insufficiently pleaded, and correctly summarily
> dismissed it.  Sockwell is not entitled to relief as to this claim.

Doc. 14-25 at 182–83 (quotations and citations omitted).  Because the ACCA affirmed the Rule 32 court's summary dismissal due to petitioner's insufficient pleading of his *Atkins* claim, the ACCA declined to "address the trial court's alternative holding that Sockwell could not establish" intellectual disability.  *Id*. at 183 n.5.  As noted previously, the ASC denied petitioner's request for certiorari review.  Doc. 14-25 at 214–16.

### d.     Petitioner's Argument Pursuant to § 2254(d)(1)

Petitioner alleges that the ACCA's conclusion that he did not plead sufficient facts to support his *Atkins* claim is an adjudication of the merits of the claim.  Pet. ¶ 130.  He maintains that the ACCA unreasonably applied *Atkins* because he alleged in his Rule 32 petition that he received an IQ score of 64 when he was twelve, "clearly indicating significantly subaverage intellectual functioning."  *Id*. at ¶ 131.  He further alleges that his Rule 32 petition "pleaded a number of facts indicating significant or substantial deficits in adaptive behavior[.]"  *Id*.  He appears to concede, however, that these facts were alleged in disparate portions of the Rule 32 petition as factual support for unrelated claims.  *Id*.  Nevertheless, he argues the ACCA unreasonably failed to recognize these factual allegations in its assessment of the sufficiency of his pleading of the *Atkins* claim.  *Id*.  He also argues that he is entitled

to an evidentiary hearing in this court because he "was improperly hamstrung in the state courts from further developing his *Atkins* claim[.]" *Id*. at ¶ 132.

### e. *Application*

The ACCA's conclusion that petitioner failed to adequately plead facts to support his *Atkins* claim was not contrary to, or an unreasonable application of, *Atkins*, and was not based upon an unreasonable determination of fact. Petitioner plainly did not plead in the relevant part of his petition facts establishing that, both before the age of eighteen and at the time of the crime, he had significant or substantial deficits in adaptive behavior. Petitioner does not even argue that he pleaded such facts in his *Atkins* claim in his amended Rule 32 petition. Instead, he argues that stray factual allegations taken from other portions of the amended Rule 32 petition could have provided the requisite allegations about deficits in adaptive functioning. *See* Pet. ¶ 131.

For example, petitioner cites the amended Rule 32 petition's allegations that, *inter alia*, petitioner "is illiterate, grew up in poverty, was recommended for special education classes (which his mother refused to allow), left school after the ninth grade, and had an IQ in the low 60s." Doc. 14-17 at 131–32. But these allegations were presented as part of the "Factual Innocence" section of Claim One of the amended Rule 32 petition, which alleged as follows:

THE PROSECUTION FAILED TO PROVE PETITIONER'S GUILT BEYOND A REASONABLE DOUBT AS TO THE CHARGE OF CAPITAL MURDER AND MURDER, AND THE CONVICTION HEREIN AND SENTENCE OF DEATH THERFORE DEPRIVED PETITIONER OF HIS RIGHT TO DUE PROCESS, IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE CONSITUTION OF THE UNITED STATES, AND THE CONSITUTTION AND LAWS OF ALABAMA.

*Id*. at 129.  Furthermore, these allegations appear to have been offered, not as proof of intellectual disability, but as a predicate to support petitioner's claim that his inculpatory statement to investigators was false.

Petitioner also cites the Rule 32 petition's allegation that he "has a long, well documented history of mental retardation and impairment." Doc. 14-17 at 134.  But this allegation was presented in his claim alleging that counsel was ineffective in pretrial investigation of petitioner's background and "mental impairments."  *Id*. Likewise, petitioner points to the amended Rule 32 petition's allegation that counsel "did not present school records to reflect [his] mental retardation, adjustment problems, need for special education placement."  *Id*. at 144.  But, again, these allegations were presented in support of the Rule 32 petition's claim that counsel rendered ineffective assistance at the penalty phase of trial.

Even if all of the above scattered Rule 32 allegations describing petitioner's impairments adequately alleged significant or substantial deficits in adaptive behavior pursuant to *Perkins*, and this court does not conclude that they do,

124

petitioner has pointed to no authority that would require a state court to scour a lengthy petition in search of allegations that might support an *Atkins* claim that the petitioner otherwise failed to properly support with clear, relevant factual allegations. As the ACCA observed, Rule 32.6(b) certainly requires more, and nothing in *Atkins* or any other clearly established federal law renders that conclusion unreasonable.

At bottom, the *Atkins* claim in petitioner's amended Rule 32 petition makes no reference to the definition of intellectual disability adopted by the Alabama Supreme Court and does not even arguably present any factual allegations to establish at least one of the three requirements of Alabama's test. Instead, apart from a single allegation about petitioner's IQ score from school records and an assessment after his arrest that he functioned in the "borderline" range of intelligence, the Rule 32 petition only presents several conclusory statements that petitioner is "mentally retarded" and due to have his sentence vacated.

Hence, the ACCA did not unreasonably apply *Atkins* in concluding that petitioner failed to plead sufficient facts to substantiate his claim. *See Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010) (concluding that the state court did not unreasonably apply *Atkins* when it summarily dismissed *Atkins* claim for insufficient pleading because the Rule 32 petition alleged only that the petitioner "was diagnosed

as mildly mentally retarded in the fifth grade"). *See also Smith v. Campbell*, 620 F. App'x 734, 748 n.20 (11th Cir. 2015) (remarking, "where a state court accurately identifies what allegations were included in a petition and concludes that those allegations failed to meet a pleading requirement, that is a legal conclusion, which is subject to review under § 2254(d)(1)). Nor is the ACCA's factual determination that petitioner only "pleaded a conclusion that he is mentally retarded" an unreasonable determination of the facts based upon the record before the ACCA. *See Smith*, 620 F. App'x at 748–49 (state court's "factual determination about whether" Rule 32 petition's *Atkins* claim "recounted any facts at all or only conclusory allegations" is reviewed pursuant to § 2254(d)(2)).

Finally, because petitioner has not demonstrated that the ACCA's decision was contrary to, or an involved an unreasonable application of, clearly established federal law, and was not based upon an unreasonable determination of fact, his request for an evidentiary hearing in this court must be denied. This court is required to deny habeas relief on petitioner's *Atkins* claim if he cannot satisfy AEDPA's standard of review. § 2254(d). In that review, this court is permitted to consider only the record that was before the state court at the time it rendered its decision denying the *Atkins* claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Because, for the reasons given above, petitioner cannot satisfy AEDPA's

standard of review, he is not entitled to a federal evidentiary hearing on his *Atkins* claim.  *See, e.g., Jenkins v. Comm'r, Alabama Dep't of Corr.*, 963 F.3d 1248, 1278 n.16 (11th Cir. 2020).

## V.  CERTIFICATE OF APPEALABILITY

In pertinent part, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides as follows:  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  . . .  If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability is necessary before a petitioner may pursue an appeal in a habeas corpus proceeding.  28 U.S.C. § 2253.  To mandate the issuance of a certificate of appealability, a petitioner must make a "substantial showing of the denial of a constitutional right."  § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).  Generally, such a showing requires something more than absence of frivolity, and it is a higher standard than the good faith requirement of 28 U.S.C. § 1915(d).  *See Clements v. Wainwright*, 648 F.2d 979, 981 (5th Cir. 1981).  In short, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

127

further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*, 463 U.S. at 893 and n.4) (internal quotations omitted). Based upon careful consideration, petitioner has made a substantial showing of the denial of a constitutional right on the following issue:

Whether the State exercised its peremptory challenge of veniremember Eric Davis in a racially discriminatory manner.

Accordingly, it is ORDERED that a Certificate of Appealability is granted as to the issue listed above.

## VI. CONCLUSION

For the foregoing reasons, it is ORDERED that Sockwell's petition for writ of habeas corpus is DISMISSED without an evidentiary hearing.

An appropriate final judgment will follow.

DONE this 29th day of September, 2023.

_____  /s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE

128